Filed 2/22/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

JARVIS J. MASTERS,

        Defendant and Appellant.

S016883

Marin County
Super. Ct. No. 10467

A jury convicted defendant Jarvis J. Masters of the first degree murder of Sergeant Dean Burchfield, a correctional officer at San Quentin State Prison (Pen. Code, §§ 187, subd. (a), 189; further undesignated statutory references are to the Penal Code), and conspiracy (§ 182) to commit murder and to commit assault on correctional staff (§ 4501), and found true the special circumstance allegation that the murder involved the knowing and intentional killing of a peace officer engaged in the performance of his duties (§ 190.2, subd. (a)(7)). The jury returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and sentenced Masters to death on the murder count and to life with the possibility of parole on the conspiracy count.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

# I. FACTUAL BACKGROUND

Masters, fellow inmates Andre Johnson and Lawrence Woodard, and the prosecutor's main witness, Rufus Willis, were members of a prison gang housed in the section of San Quentin State Prison where the murder of Sergeant Burchfield occurred.  In May 1985, these prisoners and others formed a conspiracy to assault prison guards.  Masters, Woodard, Willis, and others decided Sergeant Burchfield would be the first target of the plot, and Johnson stabbed him to death with a prisoner-made weapon on the night of June 8, 1985.

Masters, Johnson, and Woodard were tried simultaneously before two separate juries:  one for Masters and Woodard, and the other for Johnson.  Willis testified against them under a grant of immunity.

Masters, Johnson, and Woodard were found guilty.  The jury that convicted Masters and Woodard considered Woodard's sentence first, but was unable to reach a verdict.  Following Masters's penalty phase trial and death verdict, the prosecutor elected not to retry Woodard's penalty phase, and the trial court sentenced him to life imprisonment without the possibility of parole.  (*People v. Johnson* (1993) 19 Cal.App.4th 778, 780 (*Johnson*).)  Johnson's jury reached a verdict of death for him, but the court granted the automatic motion for modification and reduced his sentence to life without parole.  (*Ibid.*)  Johnson and Woodard appealed, and the Court of Appeal affirmed their convictions and sentences in a consolidated decision that was partially published.  (*Id.* at p. 794.)

## A.  Guilt Phase

### 1.  Prosecution Case

#### a.  The BGF

The prosecutor presented testimony and documents concerning the nature and structure of the Black Guerilla Family (BGF), an African American gang that

espoused a violent, revolutionary philosophy. The BGF clashed with other prison gangs, such as the Aryan Brotherhood and the Mexican Mafia. The BGF at times allied with another African American gang, the Crips.

The BGF was highly ordered and disciplined. Its members attended group meetings that covered subjects such as BGF history and philosophy and the manufacture and use of prisoner-made weapons. Members were required to write and possess various BGF-related documents, such as daily reports of their activities or maps of their housing sections that showed the gang affiliations of nearby prisoners. The BGF used various codes and Swahili words to communicate and identify themselves.

The BGF had a well-defined hierarchical structure. In addition to the main central committee, each section of the prison had its own central committee. BGF members were assigned various ranks and areas of authority.

### b. The Conspiracy

Rufus Willis testified about the formation of the conspiracy to murder Sergeant Burchfield. Willis was serving a 25-year-to-life sentence for murder, kidnapping, and robbery at Folsom Prison when he joined the BGF in 1982. He rose through the ranks, eventually becoming the commander of "Donner" section in San Quentin. Several weeks before Sergeant Burchfield's murder, Willis received a note from Willie Redmond, the BGF commander in "Carson" section, mentioning that he was planning to assault a prison staff member. Willis was soon after transferred to Carson section and became the "Akili," the intelligence officer, on the BGF central committee in that section. Also on the Carson section committee were Lawrence Woodard, a lieutenant, and Masters, who served as the "Usalama," the security chief.

Masters, Woodard, Willis, and Redmond met on the exercise yard to discuss BGF activities. According to Willis, Masters at the first meeting presented a plan to assault Aryan Brotherhood and Mexican Mafia members. Redmond rejected the plan because he wanted to assault prison guards first before attacking the other gangs. Redmond ordered Masters to revise the plan.

At a second meeting on the exercise yard with Woodard, Willis, Redmond, and another BGF committee member, Masters presented his new plan. Masters had created a list of several officers to assault. It was decided that Sergeant Burchfield would be the first target because Redmond believed he had been supplying Aryan Brotherhood members with weaponry. Willis suggested that Andre Johnson should be the one to commit the attack. After the second meeting, Redmond was transferred out of Carson section.

Masters, Woodard, Willis, and another Carson section committee member met again in the exercise yard to further discuss the plan. Members of the committee also met with members of the Crips to convince them to join in the plot to assault the guards. Willis twice met on the exercise yard with Crips members, and Masters was at one of those meetings.

Masters, Woodard, and Willis agreed on the plan for Johnson to assault Sergeant Burchfield. Masters would obtain a piece of metal from another BGF member, sharpen it, and pass it to Johnson. Johnson was chosen to commit the assault in part because he was housed on the second tier of cells in Carson section. Because of the inadequate lighting in the prison, this tier was quite dark during Sergeant Burchfield's night shift. Masters would arrange for an inmate to indicate when Sergeant Burchfield was approaching the second tier. Johnson would stab Sergeant Burchfield when he came to his cell. After the assault, Johnson was to pass the weapon to another BGF member on the second tier, who would dispose of it.

4

Willis also testified about the Swahili and code names used by various BGF members. Willis was known as "Zulu" and "A-1." He claimed Masters was known as "Askari," "Askari II," "Askari Left Hand," and "U-1." Johnson was known as "Little Askari," "Somo," "Dray," and "the Younger." Woodard was known as "Old Man Askari" and "M-II."

### c. The Murder

On June 8, 1985, Sergeant Burchfield started his assigned shift at 11:00 p.m. He mentioned to the other officers that Carson section seemed especially noisy that night, and he was going to walk the tiers to check on the prisoners. Officer Rick Lipton was assigned to patrol the gunrail, a separate elevated walkway that paralleled the cell tiers. Officer Lipton was armed with a rifle and followed roughly in line with Sergeant Burchfield as he walked along the cells. Because of the darkness, Officer Lipton could only see Sergeant Burchfield from the waist down. At some point along the first few cells on the second tier, Officer Lipton saw Sergeant Burchfield stop in front of a cell, and then stumble backward against the railing and collapse in the middle of the tier. Sergeant Burchfield later died of a single chest wound.

At trial, Officer Lipton testified that the stabbing occurred near the front of the second cell on the second tier, which was Johnson's cell. He told the same thing to his girlfriend and the officer that relieved him that night. However, Officer Lipton later told the investigating officers, wrote in his report, and testified at the preliminary hearing that the stabbing happened in front of the fourth cell, which housed a member of the Crips gang. Masters was housed in a cell on the fourth tier at the time of the murder.

### d. The Investigation

Within 15 minutes of the murder, an officer found a sharpened piece of metal on the floor of a secured area of the first tier of Carson section, roughly below Johnson's cell. The metal had no evidence of blood on it, but an FBI metallurgist determined that it had been cut from the bed in a BGF member's cell in Carson section. This weapon could have inflicted the wound to Sergeant Burchfield. Officers later found a makeshift spear shaft created from rolled-up newspaper and cloth on top of a security screen, also generally below Johnson's cell. In later searches in the cells and common areas of Carson section, officers found other pieces of metal that came from the same bed, as well as many other prisoner-made weapons. The items found in the common areas were not preserved.

In the days following the murder, Willis tried to contact prison officials with an offer to provide information in exchange for his release from prison. Willis eventually met with an investigator from the prosecutor's office to discuss the murder. The investigator suggested that Willis would be released from prison if he cooperated with the investigation. But the prosecutor later told Willis that there would be no agreement for his release. The prosecutor offered to notify the parole board of his assistance, told Willis he would be granted immunity for the crimes he had committed in prison, including his participation in Sergeant Burchfield's murder, and that he would be moved to an out-of-state prison for his protection.

After meeting with the investigator, Willis wrote to Masters and requested details about the murder. Shortly thereafter, Willis testified he received a note addressed to another BGF member; the jury also heard, however, that at the preliminary hearing Willis testified this note was originally addressed to him, but he altered the note. Willis testified, and a handwriting expert confirmed, that the note was in Masters's handwriting. According to Willis's translation of the terms and names in the notes, the note's author discussed having sharpened a piece of

6

metal, the author did not know whether the weapon used on Sergeant Burchfield had been passed along to be destroyed as had been planned, and the author was trying to ensure members of the Crips would commit the next attack on a guard. The note was signed with an ambiguous code name.

Not satisfied with the note, Willis again wrote to Masters and requested a report about the attack. Willis received a document, confirmed by a handwriting expert to be in Masters's handwriting, entitled "Usalama Report." It set out the reasons and planning behind "[t]he usalama assignment carried out on [June 8, 1985]." The report explained that Sergeant Burchfield had been communicating with members of the Aryan Brotherhood and supplying them with weapons. It also stated that Masters and others "approved" of the attack and "prepared" Johnson for it. It stated Johnson had been effective, and only BGF members knew he was the killer. It also discussed the plan to coordinate the attacks to be committed by Crips members. The note was signed with a code name assigned to Masters. Willis testified that "about a half hour or hour" had elapsed between his first request for details about the murder and his receipt of the second note.

After Willis began cooperating with the authorities, he sent a series of notes to Johnson. Johnson replied, answering a number of questions about the murder. Johnson confirmed that he stabbed Sergeant Burchfield with a makeshift spear and that afterward he tore the sharpened piece of metal off the spear shaft and threw both pieces off the tier. Johnson's note stated that "Askari" had sharpened the metal and that "Askari II" had sent it to Johnson. Willis testified that both of these names referred to Masters.

Bobby Evans was also imprisoned in San Quentin in 1985. He testified he was an "enforcer" on the BGF main central committee. He had not been aware of the plan to assault Sergeant Burchfield before the murder. Approximately one month after the stabbing, Evans was transferred to the prison's adjustment center.

7

Eventually, Masters, Johnson, and Woodard were housed there as well. Each of them told Evans about their involvement in the killing. Their statements were essentially consistent with Willis's testimony. Specifically, Masters told Evans that he was part of the BGF central committee in Carson section and had voted in favor of killing Sergeant Burchfield.

### 2. Defense Case

The defense focused on undermining the credibility of Willis and Evans, and disputing the significance of the BGF notes. While in prison, Willis had committed and ordered the stabbings of several inmates. He had distributed illegal drugs. He had extorted prison staff by promising them protection or threatening to harm them. In exchange, Willis sought favors, such as freedom to pass notes and weapons to other inmates and access to other inmates' confidential files.

Willis initially provided information about Sergeant Burchfield's murder to the authorities because he hoped to be able to work out a deal in which he would be released from prison. Even after the prosecutor promised only immunity and protective measures, Willis told two other inmates that he had come up with a plan to be released early. He told one of these inmates that he "would do whatever he had to do to make sure he didn't spend the rest of his life in prison."

Willis admitted that BGF notes were sometimes written by several people to obscure the identity of their authors. Willis had made some alterations to the notes incriminating Masters, such as substituting another BGF member's code name for his own. After Sergeant Burchfield's murder, Willis destroyed up to 300 notes he and other BGF members had authored.

Masters also presented evidence suggesting that Willis was angry with the BGF, that he actually considered himself to be a member of the Crips, and that he had made his own plans to assault prison staff and other inmates. A Crips member

8

who had been incarcerated in San Quentin testified that Willis told him in 1983 that the BGF was responsible for the death of one of Willis's friends at Folsom Prison. Willis had tried to intervene in an assault on his friend but was also attacked. Willis said he was planning to get revenge on the BGF. According to this Crips member, the BGF and the Crips were not allies, but were in conflict.

Willis's cousin was an inmate in San Quentin in 1984. He testified that Willis had said he wanted to leave the BGF. Willis was planning to form an independent "hit squad" that would assault prison staff. Another incarcerated Crips member also heard Willis discuss his hit squad and plans to assault staff members. This inmate and Willis's cousin believed Willis was manipulative and untrustworthy. Two inmates who were imprisoned with Willis after he began cooperating with the authorities testified that Willis claimed to be a member of the Crips.

Evans's credibility was similarly attacked through evidence of his extensive criminal history and motives for testifying for the prosecution. He had been convicted of four burglaries and an attempted robbery. He admitted that he had stabbed numerous inmates. He also testified that while out of prison he had supervised the BGF's street crimes. Evans did not testify under a grant of immunity. As discussed more fully below, however, according to Evans and James Hahn of the Department of Corrections, Evans testified in exchange for safety and security considerations.

Masters also presented the theory that Sergeant Burchfield had been killed by the Crips, not the BGF. According to Willis, when he met with Crips members to discuss the plan for coordinated attacks, they wanted to wait for the anniversary of the murder of one of its members named Montgomery. One of the officers who responded to Carson section immediately after Sergeant Burchfield's murder heard someone yell, "Let's get another one for Montgomery."

9

Officer Lipton on different occasions had said that Sergeant Burchfield was stabbed near the fourth cell on the second tier, which at the time of the murder housed a Crips member. A correctional officer found what might have been blood on the bars of that cell.

In addition, another correctional officer had found a state-issued shoe on top of the security screen, near the spear shaft. The shoe had a piece of metal in it that was cut from the same source as the sharpened piece believed to have been used to stab Sergeant Burchfield. Officers searched the fourth cell on the second tier and found only three shoes.

Finally, Masters highlighted many of the shortcomings in the prison staff's investigation. For instance, the correctional officer who found the sharpened piece of metal believed to have been used to stab Sergeant Burchfield carried it around in his pocket for several hours rather than immediately preserving it as evidence. The envelopes that later held this piece of metal were not retained. Many items of possible significance were lost or destroyed, including various other prisoner-made weapons, the seized shoes, and numerous inmate notes that contained supposed tips about or claims of responsibility for the murder.

## B. Penalty Phase

### 1. Case in Aggravation

The prosecutor presented evidence regarding Masters's extensive juvenile and adult criminal record. The prosecutor also presented evidence of Masters's history of unadjudicated criminal activity, which included two murders.

In 1974, when Masters was 12 years old, he took some change from another boy's pocket, but ultimately gave the money back after the boy pleaded with Masters not to take it. Masters later told police that he had merely borrowed a dime from the boy but returned it when the boy said he wanted it back.

10

In 1975, when Masters was 13 years old, he got into a fight and cut another boy with a knife. A short time later, Masters came to the boy's house armed with a handgun and fired it at the house, yelling, "I'm going to kill you." Masters was arrested and admitted to the police that he had gone to the house with a makeshift gun and had pulled the trigger but claimed it did not fire.

In 1976, when Masters was 14 years old, he got into a confrontation with a fellow student at school and screamed that he was going to kill the boy. Masters found a hacksaw and threatened to kill the other student.

Also around that time, Masters was taken to the principal's office for a disciplinary problem and he tried to climb out the window. When the assistant principal intervened, Masters picked up a large metal hole punch and threatened to kill him with it.

Around a week later, Masters and another boy stopped a boy riding his bike and demanded that he give them his watch, which the cyclist did. Masters was later arrested and told the police that he merely asked to see the watch and that after he looked at it, he gave it to the other boy, who ran away with it.

By 1978, when Masters was 16 years old, he had been adjudicated a ward of the California Youth Authority. He and two other wards forced a fourth ward to perform a sex act on one of them. Masters hit the victim, pinned him to the floor, and warned him not to tell the authorities. The next day, Masters and one of the other wards again beat the victim and forced him to orally copulate the other ward. The victim reported the incidents to a counselor. The victim testified at trial that these incidents did not happen. But he had told the prosecutor earlier that the report he gave was true and that he did not want to testify against Masters. Another former ward in the same facility testified that he saw the assaults. During his case in mitigation, Masters testified that he used to "pick on" the victim, but that any sexual activity the victim had engaged in was consensual.

11

When Masters was 17 years old, he and another person robbed a gas station, threatening the owner with a rifle. Masters was arrested and prosecuted as an adult, pleaded guilty to robbery, and admitted he personally used a firearm.

In 1980, after he turned 18, Masters committed a string of robberies in the Los Angeles area that continued until he was arrested a few months later. The jury heard testimony about several of these robberies. For example, during a two-week period, Masters robbed the same restaurant three times. He was armed with a handgun each time. During one of those robberies, Masters struck one of the victims with his gun. During another, he brandished his gun and said to one of his victims, "I'll blow your motherfucking brains out."

After the police arrested Masters, he admitted committing several of the robberies. He told the officers he would "get off anyway," explaining that he would "beat it" because he would "just have a psychiatrist tell [the jury] how crazy" he was. Masters also professed to "know how the system works," asserting that he would not be charged with all the robberies and at most would serve "only a couple of years." He said he had hidden the guns used during the robberies and would not say where because he would need them when he got out.

Masters was also implicated in two other robbery-related incidents that occurred during his robbery spree. In one incident, two police officers were dispatched to a robbery in progress at a gas station. After they arrived, one of the officers saw a flash from a gunshot and then heard another shot. The officers searched for the assailant but did not locate anyone. Masters later admitted to the police that he and another man had gone to the gas station to commit a robbery. When the police arrived, he hid behind a tree and shot at the officers.

In the other incident, Bob Hamil was killed during a robbery in his liquor store. Masters initially told the police he did not commit this robbery, but claimed to have heard about the crime. When questioned by the police, however, some of

12

Masters's statements implied he had been a participant. For example, Masters stated, "It looked like [Hamil] got a gun and was going to run after us and shoot at us from the back." When asked why Masters used a partner for this robbery, he responded, "Because the dude really knows the freeways." When asked if he was "loaded" during the robbery, Masters initially replied, "No, I wasn't loaded," but then denied any involvement. Masters also was familiar with details of the crime, including the fact that Hamil was shot in the chest, that Hamil had a .38-caliber handgun, and that the robbers drove away in a stolen Camaro.

In 1981, when Masters was 19 and incarcerated in county jail on the robbery charges, a deputy found in his cell a double-edge razor blade attached to a toothbrush and a single-edge razor blade melted into some tubing. As the deputy led Masters away from the cell, he told another inmate that he "just got busted with a shank."

Around that time, Masters had a physical altercation with some deputies. Several deputies were attempting to subdue an inmate who had been fighting when Masters began screaming and attempting to "rile" other inmates. When the deputies tried to remove Masters from his cell, he pushed one of them in the chest. Masters struggled with the five deputies attempting to control him until they were able to handcuff him.

Masters eventually was convicted of 12 counts of robbery, and he was found to have personally used a firearm in seven of them. He received a 20-year sentence.

While Masters was imprisoned at San Quentin in 1984 for his robbery convictions, inmate David Jackson was killed on the exercise yard. A guard saw Jackson walk toward Masters and a group of other inmates. The guard looked away, and when he looked back, he saw Jackson staggering away from the group

13

with blood on his shirt and a prisoner-made knife sticking out of his neck. Jackson later died at the hospital.

Masters was transferred to the adjustment center in the prison soon after Jackson's death. Masters told Johnnie Hoze, the BGF security chief in the center, that he had been transferred there for killing Jackson. Masters said that he had stabbed Jackson in the neck and left the weapon there. Several times over the next year, Masters told several BGF members that he had killed Jackson. Masters said that Jackson was murdered because he had been buying drugs from a Caucasian instead of BGF members. Masters also said that the "adrenalin rush" that he experienced while stabbing Jackson was better than having sex.

A few months after Jackson's death, a correctional officer searching Masters's cell found a two-inch-long prisoner-made weapon. A few months after that, a correctional officer was escorting an inmate when a nearly six-foot-long spear flew out of Masters's cell. The spear, made of a rolled-up newspaper and a sharpened piece of metal, narrowly missed hitting the inmate in the neck.

Masters attempted to escape during the course of his trial. A deputy sheriff was in the process of removing Masters's restraints in a holding cell when an altercation occurred between Lawrence Woodard and other deputies. Masters's hands and feet had been freed from his waist chain, and he ran for the door. The deputy tackled Masters, but the officer hit his head on a bench as they were falling. Masters got up and again ran for the door. The deputy was able to grab Masters's waist chain. As the deputy tried to grab Masters's arms, Masters began swinging his elbows, hitting the deputy once in the neck. The deputy pinned Masters against a wall until other deputies arrived and were able to subdue him.

14

## 2. *Case in Mitigation*

To establish lingering doubt, Masters sought to further undermine the credibility of Bobby Evans's testimony that Masters had admitted his role in Sergeant Burchfield's murder. Masters also challenged the evidence tying Masters to the Hamil and Jackson murders, and disputed the significance of the other unadjudicated violent criminal activity. Further, the defense recounted Masters's social history of neglect, abuse, crime, and violence; described prison conditions and the effect they had on prisoners; and discussed Masters's ability to be lawful and productive if sentenced to life imprisonment.

### a. *Bobby Evans*

Bobby Evans was recalled as a witness. He testified that before being imprisoned, he had been hired to shoot several people. He ultimately shot six people, but none died.

James Hahn was a parole agent employed by Department of Corrections. He was also recalled to testify about the actions he took on Evans's behalf. He spoke to Evans around 10 times between June 1989 and October 30, 1989, the date Evans first testified at trial. In June, Evans told Agent Hahn that he was facing prison time after pleading guilty to attempted robbery in Alameda County, and that he did not want to return to prison because the BGF had threatened to kill him. Agent Hahn told Evans he would "take care" of Evans's safety and security, but could not make any promises regarding either Evans's case in Alameda County or any other benefit he might receive for providing information. Agent Hahn said he would try to get the sentencing hearing in Alameda County postponed long enough so that Evans would end up serving his time in county jail rather than in prison.

Russell Giuntini was an Alameda County deputy district attorney. On two or three occasions, Agent Hahn called him and asked that Evans's sentencing hearing be postponed.

Agent Hahn told Evans that, if he did have to return to prison, he (Hahn) would try to arrange it so that Evans could serve his sentence in another state. Agent Hahn also said he would try to place Evans and his family in a witness relocation program. Agent Hahn admitted that he did not document his efforts to have Evans's sentencing hearing postponed.

William Denny also was an Alameda County deputy district attorney. Denny was prosecuting Evans's attempted robbery case. Giuntini testified that he called Denny at Agent Hahn's behest. In response to Giuntini's inquiries, Denny twice requested that Evans's sentencing hearing be postponed. Agent Hahn also called Denny once to ask if Evans had accumulated enough presentence credits to be released based on time served.

### b. Other Criminal Activity

A police officer testified that he took no steps to charge Masters for his role in the robbery and murder of Hamil at the liquor store. Masters testified that he did not commit the robbery. During the police interview after he was arrested, Masters was intimidated because there were several officers questioning him, but there was no tape recorder. As a result, he bragged about some of the crimes he committed and then lied about others. He viewed the interview as a game.

Masters also testified about his robbery spree. After committing the gas station robbery when he was 17 years old, he was incarcerated in a California Youth Authority facility. He escaped from custody. He then committed the string of robberies because he felt he had "nothing to lose" since he would have to serve time for escaping. Masters testified that when he committed robberies he was out

16

of control and angry with himself and "the system." He denied striking or shooting anyone during any of these crimes. Masters testified that when the police officers responded to the aborted gas station robbery, he shot only into the air, not at the officers.

Masters admitted having a physical confrontation with deputies in the Los Angeles County jail and possessing prisoner-made weapons. He also testified that during the altercation with the deputy during the trial, he was not trying to escape or hit the officer with his elbows. Rather, he claimed that he was trying to intervene in and diffuse the confrontation Lawrence Woodard was having with the other deputies.

Three inmates who had been on the exercise yard when Jackson was killed testified that Masters was not near Jackson when he was stabbed. A correctional officer searched Masters immediately after Jackson's murder but found no contraband, blood, cuts, or abrasions. Masters testified that he did not stab Jackson.

Hoze testified that he withdrew from the BGF after Sergeant Burchfield's murder. He stated that he and Masters were no longer friends because Masters had threatened to kill him and his entire family. Hoze said he "wanted [Masters] dead."

Masters refused to answer any questions about Sergeant Burchfield's murder or the BGF.

### c. Masters's Social History

Masters, various family members, and others familiar with his social history testified about his family and his childhood and teenage years.

Craig Haney was a psychology professor. In his testimony, he divided Masters's social history into five stages. The first stage, from birth to age six, was

a period of neglect and abandonment by his family.  The second stage, from ages six to nine, was a period of positive social development, although it was tinged with pain due to Masters's separation from his biological family.  The third stage, from ages nine to 15, was a period of distrust of adult authority figures amid increasing influence by neighborhood gangs.  The fourth stage, from ages 15 to 18, was a period marked by both negative and positive experiences in institutional settings.  The fifth stage was Masters's imprisonment in San Quentin, which Dr. Haney described as being placed in "the worst prison in the California system at the worst time in its history."

Cynthia Campbell was Masters's mother.  She had a total of eight children with five men.  Masters was her fifth child and the second of three fathered by her husband at the time, Billy Masters.  The marriage was unstable and beset with violence.  The family lived on welfare and moved frequently due to lack of money for rent.  Billy frequently physically abused Campbell and threatened to kill her.  When Masters was about two years old, Billy set a fire in their house.  Masters's maternal aunt and uncle arrived to find the children screaming and crying.  The parents were fighting.  Billy brandished a straight razor and threatened to kill them all.  Masters's uncle hit Billy with a pipe until he ran away.  He did not return to the family.  Masters had no childhood memories of his father.

After Billy left, Campbell became a prostitute and drug user.  She essentially provided no care for the children.  Eventually, they moved into a house with Otis Harris.  This relationship was also a violent one.  On one occasion, Masters and his siblings hid under a bed while Harris beat Campbell until she lost consciousness.  The children continued to be neglected.  Campbell had sex with numerous men in the house.  Masters sometimes secretly watched.  Harris and Campbell sold and took drugs in the house.  Masters felt that things were best when Campbell and Harris were high on drugs because they would be more calm.

18

After his mother gave birth to twins, Masters's older sister was responsible for taking care of the girl while Masters was responsible for taking care of the boy. The boy later died of sudden infant death syndrome. Often the children would be left alone for days without sufficient food. Campbell would sometimes arrange for other prostitutes to babysit, and they would occasionally give Masters alcohol. The house was dirty, as were the children. Eventually, people at the children's schools began washing the children and their clothes.

Harris never exhibited any affection toward Masters. He hit Masters numerous times with his hands and an electrical cord. When Masters was four or five years old, he stood with a butcher knife over a sleeping Harris and contemplated stabbing him.

When Masters was six years old, the children were placed in foster care. Masters was separated from his siblings and placed with an elderly couple, the Procks. They took good care of him. Masters became particularly close to his foster mother. When Masters was around nine years old, Mrs. Prock died, and he was placed in a new foster home. He stayed there for about a year. His new foster parents favored their biological children and treated the foster children as the "chorekeepers" of the house. Masters began running away to the Procks' house, particularly after he was not allowed to attend Mrs. Prock's funeral.

Masters was then placed in several juvenile facilities. He preferred this to living with foster parents, although he occasionally ran away. Masters received sporadic visits from various family members.

When Masters was 12 years old, he was placed in the home of his maternal uncle and his wife. He lived with them and their two children for several years. During that time, Masters's mother bought him a bike and used him as a courier for delivering drugs to her customers. Masters also became exposed to gangs through his older half-brother, Tommy. After the incident in which he shot at a

19

house, Masters was placed in juvenile camps for a number of months. When he returned to his aunt's house, he became heavily involved with a gang. He had numerous disciplinary problems at school and was disrespectful toward authority figures. The school Masters attended was considered a "holding tank" for problem students. At one point, his social worker had him committed to a hospital for psychological treatment, including forced medication.

When Masters was 15 years old, he was placed under the care of the California Youth Authority. Violence between the wards and between the staff and the wards was prevalent. Masters had testified in a civil trial regarding the conditions at a facility where he was housed.

When Masters was 16 years old, he was transferred to a different institution. Masters responded well to the emphasis on positive reinforcement. He excelled in sports, was placed on the academic honor roll, and obtained his high school diploma. A counselor testified that Masters was the "top ward in the dorm." After a year, Masters was paroled to a group home in Stockton.

Masters's family reunited, and he returned to Southern California to join them. Masters's mother was still using drugs. At times, she used Masters to deliver drugs for her. Masters stayed at his aunt's house, but he was surrounded by gangs and criminal activity. After his arrest for robbing a gas station, on the night of his 18th birthday, a group of deputies at the jail beat him up.

### d. Prison Conditions

Robert Slater was a staff psychiatrist at San Quentin from 1982 to 1984. He testified about the conditions at the prison. At that time, San Quentin housed very serious criminals, including many who had created problems at other prisons. The overcrowding of violent prisoners created "oppressive" conditions. The level of violence between inmates was so high that they generally had a "sense of

20

impending and immediate annihilation." In 1984, 12 inmates were murdered and several more who had been assaulted would have died if they had not received immediate medical attention. Much of the violence was racially motivated. The presence of armed guards on the gunrails of the prison and the frequent firing of warning shots added to the level of fear. In Dr. Slater's opinion, the only thing that prevented riots was the near-constant lockdowns. Dr. Slater believed that the constant fear led the inmates to misperceive potential threats, which could lead to their taking preemptive actions in what they believed was self-defense.

John Irwin was a sociology professor and former inmate. He agreed that the conditions at San Quentin caused prisoners to become paranoid. He explained that prison culture also encouraged inmates to bolster their reputations by falsely claiming they committed acts of violence.

Dr. Haney testified that the fearful conditions at San Quentin fostered the formation of the prison gangs. The gangs provided structure and security for their members.

### e. Masters's Future

Masters testified that he had matured and no longer wanted to participate in violence or criminal activities. Masters testified that his mother's death made him realize that life was precious. He claimed to have withdrawn from the BGF, even though doing so meant he might be attacked. According to Masters, he had intervened in several potentially violent situations and helped to resolve them peacefully.

Dr. Haney testified that he believed Masters had recently undergone significant changes that included self-improvement, openness, critical thinking, and the ability to have a perspective apart from an institutional setting. Dr. Haney trusted Masters's statement that he had withdrawn from the BGF and noted that he

21

had received only three minor disciplinary infractions since 1986. Dr. Irwin similarly testified that it is common for inmates to phase out of gangs as they age. A correctional officer testified in rebuttal, however, that he had recently observed Masters appearing to lead BGF classes on the exercise yard.

Dr. Haney testified that Masters would adapt well if he were to be confined under a life sentence in a highly structured prison environment.

## II. PRETRIAL ISSUES

### A. Denial of Pretestimony Lineup and Questioning

Masters contends that rulings by the magistrate at the preliminary hearing and by the trial court erroneously prevented him from testing the accuracy of Willis's identification of him. In this claim, as in most of his claims on appeal, Masters contends that the asserted error or misconduct he raises infringed his state and federal constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17, applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue

22

actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.  No separate constitutional discussion is required in such cases, and we therefore provide none."  (Italics in original.)

In order to test Willis's ability to identify Masters, Johnson, and Woodard, the magistrate granted their request that they not initially be in the courtroom while he testified at the preliminary hearing.  Outside their presence, Willis testified he had known each of them for a few months before Sergeant Burchfield was murdered.  Willis testified that he had seen Masters as he walked past Willis's cell and that they had met several times on the exercise yard.

Masters's counsel then asked Willis a series of questions about Masters's appearance:

"Q.  Mr. Masters is about maybe five seven in height, right?

"A.  Somewhere — yes, maybe.

"Q.  And he's probably about, what, maybe 195, 200 pounds?

"A.  I don't think he's that heavy.

"Q.  About 190?

"A.  I don't think he's that heavy.

"Q.  140, what?

"A.  Somewhere up in there.  Between 140, 160 pounds.

"Q.  He's very — very light skinned; isn't he?

"A.  No, he's not.

"Q.  Very dark skinned?

"A.  Dark skinned.

"Q.  He didn't have any scars or other marks on his face; did he?

"A.  I don't remember.

"Q.  He didn't have any tattoos on his body anywhere?

"A.  I don't remember.

23

"Q. Didn't have any tattoos on his face; did he?

"A. I don't remember.

"Q. He wore glasses; is that right?

"A. That is correct.

"Q. He had a big afro; is that right?

"A. That is wrong.

"Q. He had a small afro?

"A. Yes, he kept his hair about as short as mine.

"Q. He didn't have any facial hair [between January and June 1985], did he?

"A. I don't remember.  [¶] . . . [¶]

"Q. Okay.  He's a fellow probably in his early 30s when you saw him?

"A. He looked to be.

"Q. Early — early 30s?

"A. He looked to be in his 30s, I don't know whether it was early or late, I'm just saying he looked to be in his 30s.  He looked rather old to me.

"Q. He looked like mid to latter part of his 30s maybe, maybe that old?

"A. I don't know, it just looked like maybe he was in his 30s.  Maybe early 30s —

"Q. Okay.

"A. Or late 20s.   [¶] . . . [¶]

"Q. He had an earring in his left ear, right — was it left — left ear; didn't he? [¶] . . . [¶]

"A. I ain't never seen him with an earring.

"Q. Okay.  His tone of voice is very loud, deep voice, right?

"A. Squeaky voice.

"Q. Squeaky voice.  He's built rather stocky, rather heavy?

"A. Slim.   [¶] . . . [¶]

24

"Q. You don't really remember very much about what he looks like; do you?

"A. Yes, I remember what he looks like. But he was — he was bald headed at that time, kind of chubby, he seemed to be kind of chubby.

"Q. Okay. He was bald on the top of his head?

"A. No, he kept his hair bald, all his hair, he kept his hair shaved off.

"Q. And he was kind of fat, you said?"

"A. Kind of husky. You're talking about Masters, right?

"Q. Masters, correct.

"A. That's correct. He was kind of heavy like, husky —

"Q. When you say —

"A. — chubby.

"Q. — chubby or husky, do you mean muscular or just fat?

"A. Well, he had a little stomach on him, weighed about maybe 175, 180.

"Q. Okay. What else do you remember about him, about his physical appearance?

"A. At that time he wasn't toned, by that I mean no definition in his muscular — you know, that's about it."

Outside of Willis's presence, Masters's counsel informed the magistrate that Masters's physical characteristics did not match Willis's description. According to Masters's counsel, at the time of Sergeant Burchfield's murder Masters was 22 years old, six feet tall, neither heavy nor fat; had a tattoo on his left cheek; had a mustache; and did not wear his hair as Willis described it. Masters's counsel also noted Willis's descriptions of Andre Johnson and Lawrence Woodard were "relatively accurate."

Masters's counsel requested a lineup at which Willis could attempt to identify Masters. Based on Willis's testimony "as to the number of times that [he met Masters] on the yard," the magistrate denied the request. Masters, Johnson,

25

and Woodard were brought into the courtroom but were not seated next to their respective attorneys. Willis returned to the courtroom and correctly identified each of them.

Much later during the preliminary hearing, the magistrate disclosed the existence of a prison memorandum in which inmate Harold Richardson, another BGF member, had purportedly confessed his role in the planning of Sergeant Burchfield's murder. At the time of the preliminary hearing, Richardson was 31 years old, 5 feet 7 inches tall, bald, and not wearing glasses. He weighed about 185 pounds and would not characterize his own skin as "dark." Masters believed Richardson matched Willis's description of Masters and asked to recall Willis as a witness. The magistrate denied his request.

After the preliminary hearing ended, Masters moved in the superior court to set aside and dismiss the information based in part on the magistrate's refusal to order a lineup and to recall Willis to permit him to be further questioned about his identification of Masters. The court denied the motion.

Masters contends the court's rulings denied him a fair trial. "In *Evans v. Superior Court* (1974) 11 Cal.3d 617, we held that when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of mistaken identification, due process may require 'that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate.' [Citation.] . . . A trial court ruling on a request for a pretrial lineup considers the benefits to be derived from it, the reasonableness of the request, and the resulting burden on the prosecution, the police, the court, and the witnesses. [Citation.] Further, '[t]he broad discretion vested in a trial judge or magistrate includes the right and responsibility on fairness considerations to deny a motion for a lineup when that motion is not made timely. Such motion should normally be made as soon after arrest or arraignment as practicable. We note that

26

motions which are not made until shortly before trial should, unless good cause is clearly demonstrated, be denied in most instances by reason of such delay.' [Citations.]" (*People v. Abel* (2012) 53 Cal.4th 891, 911–912.) On appeal following conviction, the defendant must demonstrate the prejudice suffered at trial caused by the magistrate's asserted error during the preliminary hearing. (See *People v. Mena* (2012) 54 Cal.4th 146, 156 (*Mena*) [citing *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529].)

In response to Masters's claim that the trial court erred in denying his request for a lineup, the Attorney General contends the request was untimely. We need not decide whether the request was timely because Masters fails to establish there is a reasonable likelihood that Willis would not have been able to properly identify him at the preliminary hearing. The magistrate ruled, and we agree, there was no reasonable likelihood of misidentification that a lineup could have resolved because Masters and Willis knew each other and had spent time together. Masters does not dispute that he and Willis were confined in the same section in San Quentin for the months preceding Sergeant Burchfield's murder and that Willis had several opportunities to see him. Willis's initial responses during the preliminary hearing to leading questions that described Masters's physical characteristics do not necessarily cast doubt on his ability to identify the participants of the conspiracy.

Even if we were to assume that the magistrate erred by denying Masters the opportunity to confront Willis with the similarities between his description of Masters and Richardson's physical characteristics, Masters fails to demonstrate that it is reasonably probable that he would have obtained a more favorable result absent the error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Mena*, *supra*, 54 Cal.4th at pp. 161, 164 [applying *Watson* standard to denial of pretrial lineup because there is no federal constitutional right to a lineup].)

27

Generally speaking, it " 'has long been recognized that "[i]n the case of in-court identifications not preceded by a lineup . . . , the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury . . . ." ' " (*Mena*, *supra*, 54 Cal.4th at p. 162.)

At trial, Masters stood before the jury, and his counsel cross-examined Willis:

"Q.  Mr. Masters, you'd say, is about six feet tall?"

"A.  Yes.  Six foot, six-one.

"Q.  Got hair on his head?

"A.  Yes.

"Q.  Mustache?

"A.  Really can't see.  It's kind of blurry.

"Q.  But he's got hair on his face?  Mustache, goatee?

"A.  Yeah.  Looks kind of dark.

"Q.  Slender, slim?

"A.  Looks husky around top.

"Q.  He's got a rather distinctive tattoo on his left cheek, doesn't he?"

"A.  I [saw] it the last time at the preliminary hearing.  [¶] . . . [¶]

"Q.  Have you ever seen Mr. Masters wear glasses?

"A.  I don't recall.  [¶] . . . [¶]

"Q.  Now this person that you claim was Mr. Masters on the yard, Mr. Willis, he wasn't six foot or six feet one, was he?

"A.  Didn't appear to be.

"Q.  In fact, he was about five feet seven.

"A.  Like I say, I recall describing him to that effect in the preliminary hearing, but I know Mr. Masters.  I've had so many meetings with Mr. Masters it's pathetic."

28

Masters had the opportunity at trial, and availed himself of the opportunity, to challenge in front of the jury Willis's identification of him. Moreover, he had the opportunity to argue to the jury the weaknesses in Willis's identification, including the lack of a lineup and the possible suggestiveness of the procedure employed at the preliminary hearing.

Even if the magistrate had permitted Masters to examine Willis about Richardson once his existence had been disclosed, there is no reasonable probability that the magistrate would have disbelieved Willis's identification of Masters as the person he met with several times on the exercise yard. Willis knew Richardson and Masters, and Willis also knew who participated in the conspiracy. In addition, Willis identified Masters at trial as one of the conspirators, and the jury heard evidence about the weaknesses in Willis's prior identification.

Moreover, a note written in Masters's handwriting also implicated him in the conspiracy. Thus, even if we were to assume that Willis had met with Richardson and not Masters in the exercise yard to discuss the attack, Masters's guilt was independently established by this and other notes. Masters's statements to Evans also confirmed his role in the conspiracy.

Further, even if we were to assume that the magistrate erred by denying his requests for a pretrial lineup and a further opportunity to examine Willis, Masters fails to demonstrate prejudicial error because the magistrate's rulings did not deny Masters a reasonable opportunity to challenge Willis's identification of him or otherwise deprive him of a fair trial. Masters's related claim that the trial court erred by denying his motion to dismiss necessarily fails for the same reasons.

### B. Denial of Motion to Sever

Before the start of the trial, Masters moved to sever his case from Johnson's and Woodard's on the ground he intended to introduce the statements from three

29

other BGF members, including Harold Richardson and Charles Drume. Masters argued for severance because these inmates' statements, discussed more fully below, implicated Johnson and Woodard but did not refer to Masters. The trial court, noting that Richardson's and Drume's statements were likely inadmissible, denied Masters's motion to sever. As noted, Johnson's case was ultimately severed from Masters's and Woodard's, and was heard by a separate jury.

Masters contends that the trial court abused its discretion by denying his motion to sever his trial. Specifically, Masters contends severance was required because admission of the statements would have violated Johnson's and Woodard's rights, and because the statements made his defense antagonistic to Johnson's and Woodard's.

There is a statutory preference for joint trials of jointly charged defendants. (§ 1098.) " 'The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " ' " (*People v. Homick* (2012) 55 Cal.4th 816, 848 (*Homick*).)

30

Masters contends that Richardson's and Drume's statements implicated *People v. Aranda* (1965) 63 Cal.2d 518 [severance may be appropriate when the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant] and *Bruton v. United States* (1968) 391 U.S. 123 [nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible at a joint trial] and therefore warranted severance. In the typical *Aranda-Bruton* situation, the prosecutor will seek to introduce at trial a statement made by one codefendant that implicates another codefendant. Here, however, *Masters* sought to introduce statements made by purported *uncharged accomplices*, and on appeal he contends *People v. Hill* (1992) 3 Cal.4th 959, 994, governs the introduction of such statements. Even if we were to assume that an uncharged accomplice's statements may be subject to *Aranda-Bruton*, in this instance it would be Johnson and Woodard who would have been prejudiced and not Masters, who was the proponent of the proffered statements.

Masters also contends that Richardson's and Drume's statements warranted severing his trial from Johnson's and Woodard's because the statements created conflicting defenses. But we need not decide whether Richardson's and Drume's statements would have created conflicting defenses that would have required severance because, as discussed more fully below, the trial court found the proffered statements unreliable and thus inadmissible. It was the court's evidentiary rulings, and not its ruling on the severance motion, that precluded Masters from using the evidence he sought to admit. As such, it properly denied Masters's motion to sever because the record does not disclose conflicting defenses in the absence of the excluded statements.

### C. Denial of Immunity for Witnesses

Masters contends BGF member Harold Richardson should have been granted immunity so that he could have been compelled to testify for Masters.

At the preliminary hearing, Masters called Richardson as a witness, and Richardson asserted his constitutional privilege against self-incrimination. Masters then requested that the prosecutor grant Richardson immunity and, in the alternative, moved for the magistrate to grant immunity. The prosecutor declined Masters's request and objected to his motion.

The magistrate then conducted an evidentiary hearing at which defense counsel examined the prosecutor. The prosecutor testified that he did not offer immunity to Richardson because Richardson had refused to a give a tape-recorded statement. The prosecutor explained that, by contrast, he had offered Willis immunity because his statements were corroborated by other evidence. The prosecutor was willing to grant immunity to another potential witness whose statements also were corroborated by other evidence and tape-recorded. No other potential witnesses were offered immunity.

Eventually, because defense counsel repeatedly asked questions that were beyond the scope of the hearing, the magistrate vacated his decision to conduct an evidentiary hearing, struck the prosecutor's testimony, and denied Masters's request to examine other witnesses. The magistrate also denied Masters's request for the production of writings concerning the prosecutor's offers of immunity. The magistrate then denied Masters's motion for a grant of immunity to Richardson.

Preliminarily, we note that it is unusual for a magistrate to conduct such an evidentiary hearing. Certainly, a court may inquire of any counsel to solicit information it needs to rule on a motion. As an officer of the court, counsel so questioned has an obligation to answer the court's inquiry honestly and, in the

absence of any appropriate claim of privilege, completely.  We express no opinion, however, as to the propriety of procedures employed by the magistrate in this case.

### 1. *Judicially Conferred Immunity*

After the preliminary hearing had ended, Masters moved in the superior court to set aside and dismiss the information based on the magistrate's refusal to grant Richardson immunity, among other grounds.  The court denied the motion.

At trial, outside the presence of the jury, Masters called Richardson as a witness, and Richardson repeatedly asserted his privilege against self-incrimination.  The trial court then stated it did not intend to grant judicial immunity to Richardson, and Masters did not press the issue.

We previously have "characterized as 'doubtful' the 'proposition that the trial court has inherent authority to grant immunity.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 468 (*Stewart*).)  We have noted that "the power to confer immunity is granted by statute to the executive." (*Ibid.*, citing § 1324.)  Moreover, "prosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant." (*People v. Williams* (2008) 43 Cal.4th 584, 622; see *People v. Samuels* (2005) 36 Cal.4th 96, 127–128 [prosecutor did not commit misconduct by not granting immunity to a nonessential defense witness who asserted her right against self-incrimination and refused to testify].)

At the same time, we have acknowledged that the Third Circuit in *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964, 972 (*Smith*), articulated limited circumstances in which judicially conferred use immunity might be constitutionally necessary.  (See *Stewart*, *supra*, 33 Cal.4th at pp. 468–469; *People v. Hunter* (1989) 49 Cal.3d 957, 974.)  *Smith* held that a court has the inherent authority to grant immunity if the failure would otherwise prevent the

defendant "from presenting exculpatory evidence which is crucial to [the defense's] case."  (*Smith*, at p. 969.)

Smith's holding, however, has been partially abrogated in *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243, 251–257 (en banc) (*Quinn*), in which the Third Circuit explained that other courts had rejected the theory of judicial use immunity and that *Smith*'s rule impermissibly interfered with the executive branch's prosecutorial discretion.  We agree with *Quinn*'s rationale and conclusion, and now hold that California courts have no authority to confer use immunity on witnesses.  Accordingly, we conclude the magistrate and the trial court were correct in denying Masters's requests for immunity for Richardson.

### 2.  *Denial of Prosecutorial Immunity*

*Smith* also described another theory by which due process may compel a defense witness to be immunized:  If a defendant can show that the prosecutor refused to grant immunity " 'with the deliberate intention of distorting the factfinding process,' " a retrial is necessary.  (*Smith*, *supra*, 615 F.2d at p. 968.)  When the prosecutor is found have committed misconduct by withholding immunity, the remedy is to set aside the conviction and permit a new trial, at which the prosecutor can be ordered "to grant statutory use immunity," so that the witness can testify, or else face "a judgment of acquittal."  (*Id.* at p. 969.)

*Quinn* adopted this theory as well as the five factors outlined in *Smith* to evaluate claims of prosecutorial misconduct:  whether "[1] [witness immunity was] properly sought in the district court; [2] the defense witness [is] available to testify; [3] the proffered testimony [is] clearly exculpatory; [4] the testimony [is] essential; and [5] there [are] no strong governmental interests which countervail against a grant of immunity."  (*Quinn*, *supra*, 728 F.3d at p. 251, quoting *Smith*, *supra*, 615 F.2d at p. 972.)  If the test is satisfied, the remedy is for the court to set aside the conviction

34

and put the prosecution to the choice of granting immunity or facing dismissal of the charges. *Quinn* emphasized that the remedy is not for the court itself to grant immunity. (*Quinn*, *supra*, 728 F.3d at pp. 259–260.)

In California, the law regarding prosecutorial misconduct is settled: "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

With these considerations in mind, we read Masters's claim to include the contention that the prosecutor committed misconduct by not granting immunity to Richardson. As we will explain, this claim of prosecutorial misconduct fails.

Even if we were to assume that *Smith* and *Quinn* state the appropriate test for evaluating a constitutional claim arising from the denial of witness immunity, Masters fails to satisfy the five factors articulated by the Third Circuit. Preliminarily, we note that *Smith* did not find the presence of prosecutorial misconduct or the need for judicially conferred immunity; rather, *Smith* found only that the evidence was sufficient to require the trial court to hold a hearing and inquire further. (*Smith*, *supra*, 615 F.2d at p. 974.) Here, by contrast, the trial court held a hearing, and it rejected Masters's motion on the merits.

Moreover, it was undisputed in *Smith* that a group of four assailants assaulted and robbed the victim; that the proposed defense witness would have testified he was one of those assailants; and that the monikers associated with the other three assailants implicated only one of the four defendants and therefore would have exonerated the remaining three defendants. (*Smith*, *supra*, 615 F.2d at

35

pp. 966–967, 974.) Here, by contrast, we have no comparable indication that Richardson would have testified that Masters was *not* involved in the murder. Although Richardson's out-of-court statements named several conspirators and did not name Masters, at no point did Richardson imply or state his list of conspirators was exhaustive. Richardson's statements did not *clearly* exculpate Masters.

In addition, other evidence demonstrated Master's guilt, including a note in his own handwriting admitting his involvement in the conspiracy. "[D]efense evidence that is *overwhelmingly* undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot be *clearly* exculpatory." (*Quinn, supra,* 728 F.3d at p. 263, italics in original; cf. *ibid.* ["This is not an instance where the defense witness's testimony (even assuming it were given as [the defendant] hopes) would make suspect the Government's case. . . . [W]e cannot conclude [the] testimony was clearly exculpatory."].) In other words, the evidence of Masters's involvement overwhelms any inferences that might have been drawn from Richardson not naming Masters as a conspirator.

Finally, Masters has not shown that the prosecutor's treatment of Richardson was an intentional effort to distort the factfinding process. In *Smith*, three of the defendants sought to introduce the potentially exculpatory testimony of a minor who "came within the exclusive jurisdiction of the juvenile authorities in the Virgin Island Attorney General's office." (*Smith, supra,* 615 F.2d at p. 967.) The record revealed that those juvenile authorities "had offered to grant . . . use immunity on the condition, prompted only out of prosecutorial courtesy, that the United States Attorney consent." (*Ibid.*) For reasons that were unexplained at trial, "this consent was never granted." (*Ibid.*) Thus, in *Smith* there was evidence in the record that there was no governmental interest against a grant of immunity.

36

(*Id*. at p. 969 [the evidence "suggest[ed] that the prosecution deliberately intended to keep this highly relevant, and possibly exculpatory, evidence from the jury"].)

Here, by contrast, although the magistrate struck the prosecutor's testimony at the preliminary hearing, it does not help Masters because the prosecutor testified that the reason he did not offer Richardson immunity was that Richardson refused to give a tape-recorded statement. The prosecutor did not act on the basis of an improper motive in requiring Richardson to give a recorded statement before offering him immunity. Similarly, the prosecutor testified that another witness was offered immunity because his potential testimony was also corroborated by other evidence, but no evidence was presented to corroborate Richardson's statements. Masters failed to show there was no countervailing governmental interest against granting immunity to Richardson.

In sum, we cannot characterize the prosecutor's decision not to grant immunity to Richardson as egregious, unfair, deceptive, or reprehensible. The prosecutor's decision was not misconduct.

### III. GUILT PHASE ISSUES

#### A. Exclusion of Inmates' Statements

The trial court excluded out-of-court statements made by two other inmates, Harold Richardson and Charles Drume, to law enforcement officials on the ground that they were inadmissible hearsay. Masters contends their statements implied that he was not involved in planning the murder of Sergeant Burchfield and would have bolstered his theory that Willis misidentified Masters as a participant in the conspiracy. Masters acknowledges the statements were hearsay but contends they were admissible as statements against the declarants' interests.

### 1. *Richardson's Statements*

In August 1986, around 14 months after Sergeant Burchfield's murder, Richardson told prison officials that he wanted to officially "drop out" of the BGF, which would have meant the authorities would no longer classify him as a member of the gang. The officials told Richardson part of the process to do so would require him to provide them with information about the BGF. (See generally Cal. Code Regs., tit. 15, § 3378 [prison regulations regarding the identification and validation of gang members].) The officials explained that it was not their intent to "use" the information Richardson would provide, that they "would do everything possible to keep the information confidential," and that they were "also committed to keep him in as safe a housing as possible." The officials told Richardson he was "not under" *Miranda v. Arizona* (1966) 384 U.S. 436; that is, they did not advise him of his rights to remain silent and to the assistance of counsel.

In his interview with prison officials, Richardson said he was a lieutenant in the BGF and knew all the details about Sergeant Burchfield's murder. Richardson claimed the murder was planned on the exercise yard by Johnson, Woodard, Willis, and himself. According to Richardson, the initial plan called for him to stab Sergeant Burchfield and for Johnson to be armed with a makeshift gun. Johnson was afraid to use the gun, so he and Richardson were to switch weapons. The plan to use a gun was abandoned because prison authorities had confiscated the BGF's gunpowder. Richardson said he helped make knives for the BGF, including the one that was used to stab Sergeant Burchfield.

The prison authorities initially refused to disclose Richardson's statements to Masters, Johnson, and Woodard. Following litigation regarding the statements' confidentiality, the court ordered that redacted versions be disclosed. The court informed Richardson that his statements could be used against him in criminal

38

proceedings. Richardson then sent a letter to one of the prison officials who had interviewed him. In it, Richardson reminded the prison official that he had been assured Masters, Johnson, and Woodard would not be informed of his statements; he also noted that he had not been advised of his right to not incriminate himself. Richardson also clarified that the plan initially called for him to stab Sergeant Burchfield and for Johnson to shoot another correctional officer, but due to Johnson's fear of the makeshift gun, they agreed to switch targets.

As noted, at the preliminary hearing, Richardson repeatedly asserted his constitutional privilege against self-incrimination. In addition, before the start of the trial, Masters moved to sever his case from Johnson's and Woodard's based on his intention to introduce Richardson's statements, among other grounds. The trial court, noting that Richardson's statements were unreliable and thus likely inadmissible, denied Masters's motion to sever.

At trial, the prosecutor sought to preclude the admission of Richardson's statements, which Masters opposed. The trial court ruled that Richardson's statements were hearsay. The court also ruled that the circumstances under which the statements were made showed they were not against his penal interest and therefore were not admissible under Evidence Code section 1230. The court additionally excluded the statements under Evidence Code section 352.

Outside of the jury's presence, Masters later proffered evidence that Richardson told another inmate sometime in August 1988 that the prison guards "have me on a hot one trying to accuse me of that thing on a [prison guard in 1985]. I cleaned up my tracks and they got some other motherfuckers for it." The trial court did not make a ruling on Masters's proffer, and the jury did not receive any evidence about this statement.

Hearsay is an out-of-court statement that is offered for the truth of the matter stated and is generally inadmissible. (Evid. Code, § 1200.) An extrajudicial

39

declaration against the declarant's penal, pecuniary, proprietary, or social interest, may be admissible as an exception to the hearsay rule. (*Id.*, § 1230.) " 'The proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's . . . interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] . . . [¶] A trial court's decision to admit or exclude evidence is a matter committed to its discretion ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584–585; see *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108–1109 (*McCurdy*).)

It is undisputed that Richardson's assertion of his privilege against self-incrimination at the preliminary hearing made him unavailable as a witness. (See Evid. Code, § 240, subd. (a)(1).) Because of the assurances Richardson received from prison officials, the parties dispute whether his statements were against his penal or social interest. At Richardson's debriefing, the prison officials expressly told him that his statements would not be used against him. The prison officials asked Richardson to incriminate himself without informing him of his right to remain silent; indeed, they deliberately did not advise him of his *Miranda* rights. And in his later letter, Richardson reminded the prison officials that he had been assured that Masters, Johnson, and Woodard would not be told of his statements.

40

The trial court ruled that Richardson's initial statements were not against his penal interest because he was advised they would not, and could not, be used against him. It further described Richardson's follow-up letter as a "non-statement" because it did not refer to Masters. The trial court's reasoning that Richardson's statements were not against his penal interest is questionable. "[A]s one federal court has explained in rejecting a similar argument: 'The question as to such declarations is whether under the circumstances the declarant would have been unlikely to say it had it not been true. To be against penal interest under [Federal Rules of Evidence, rule 804(b)(3), 28 U.S.C.], the statement need not be made to persons who are likely to use it against the declarant in court proceedings. Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy.' (*U.S. v. Badalamenti* (S.D.N.Y. 1986) 626 F.Supp. 658, 666–667 [rejecting argument that 'the Mafia's code of silence eliminated any risk that the declarants would incur criminal liability in making the declarations'].)" (*People v. Valdez* (2012) 55 Cal.4th 82, 144 (*Valdez*).) Although Richardson's statements to the prison officials and this other inmate were likely made in confidence, his expectation that they would not be used in criminal proceedings against him or revealed to other inmates, including other BGF members, does not negate that they may have been against his penal interest.

Nonetheless, Richardson's statements were properly excluded on the ground that they were insufficiently trustworthy and therefore unreliable. In ruling on Masters's motion to sever his trial from Johnson's and Woodard's, the trial court expressed doubt about "the time element" with Richardson's statements: "It wasn't made within a few days or a few weeks of the incident, it was made a year and a half, a year later . . . so that its reliability is questionable in that respect."

41

The significant passage of time is a relevant circumstance to be considered when determining a statement's reliability. In fact, Richardson did not make his statements until after these charges had been filed. (Cf. *Valdez*, *supra*, 55 Cal.4th at pp. 94, 139 [affirming introduction of gang member's statement against penal interest that was made three months before the victims' bodies were discovered].) As the trial court noted, "Every prisoner who's testified has said they heard about the crime within hours or days of the crime itself and it went around the prison like wildfire which one would expect would happen." Yet Richardson waited for over a year to make these statements to prison authorities. Thus, Richardson's statements did not necessarily show his personal knowledge of the crime, as he had ample opportunity to learn the details from other inmates.

Masters nonetheless contends that no reasonable person in Richardson's position would have falsely confessed to planning Sergeant Burchfield's murder because the statements could have subjected Richardson not only to criminal prosecution but also to possible retaliation by the BGF. But Richardson could have decided to provide false statements to prison officials for various possible reasons — for example, in exchange for a benefit, to weaken the prosecutor's case against his fellow gang members by spreading disinformation, or because he thought the statements would convince the prison authorities about his desire to leave the BGF.

Masters notes that Richardson unsuccessfully sought to maintain the confidentiality of his statements and also refused to cooperate with the defendants, from which he infers that Richardson believed the information was accurate. Richardson's desire to maintain the confidentiality of his statements, however, could have been motivated by his desire to prevent the defendants or other inmates from learning the very fact that he had collaborated with prison officials. His

efforts to conceal his statements did not necessarily vouch for the veracity of what he had told the prison officials.

Moreover, Richardson was a convicted felon, a circumstance of which the trial court was undoubtedly aware when determining the reliability of his statements. (See Evid. Code, § 788 [a witness's credibility may be impeached by his or her felony convictions].) Richardson's status as a convicted felon was another possible factor upon which the trial court could have relied upon in determining that his statements were incredible and therefore unreliable.

Masters further points out that prison authorities provided him with only redacted versions of Richardson's statements. He contends that Evidence Code section 1042 obligated the trial court to infer that the redactions contained information that would have bolstered Richardson's reliability. That statute provides, in pertinent part, that if a claim of privilege by the state is sustained in a criminal proceeding, the court shall make a finding of fact adverse to the public entity upon any issue to which the privileged information is material. Here, it was the court that redacted the privileged material in Richardson's statements. Evidence Code section 1042 is inapplicable because the court knew what the redacted information contained, and it had ruled that the information was not material to Sergeant Burchfield's murder. As such, and as the finder of fact in this situation, it was not required to assume an adverse inference about the withheld statements.

### 2. *Drume's Statements*

On December 8, 1987, around 30 months after Sergeant Burchfield's murder, Drume wrote in a letter addressed to the Marin County Clerk that he had information about "the murder of a sergeant" at San Quentin. In an interview with law enforcement personnel later that month, Drume said he was the BGF head of

43

security for Carson section when Sergeant Burchfield was murdered. Drume said that he, Woodard, and two other BGF members planned the murder and that he "made the knife" that was used to stab Sergeant Burchfield.

As part of his pretrial motion to sever his case, Masters indicated his intention to introduce Drume's statements at trial. As with Richardson's statements, the trial court doubted the reliability of Drume's statements, and denied Masters's motion to sever.

At trial, Masters sought to introduce Drume's statements into evidence. As with Richardson's statements, the trial court excluded Drume's statements as inadmissible hearsay because they were unreliable; it also excluded them under Evidence Code section 352.

The parties do not dispute Drume's unavailability at trial or that his statements were against his penal interest. For substantially the same reasons as apply to Richardson's statements, however, the trial court did not abuse its discretion in finding Drume's statements lacked sufficient trustworthiness. Like Richardson, Drume could have been motivated to make the statements to curry favor with law enforcement, or to enhance his reputation among other prisoners. In addition, Drume had even more time than Richardson to glean information about the conspiracy before giving his version of events.

## B. Exclusion of Defense Expert Testimony

Masters contends that the trial court abused its discretion by excluding as irrelevant the proffered expert testimony of a witness familiar with prison culture. The Court of Appeal rejected a similar challenge to this relevancy ruling in Johnson's and Woodard's appeal. (*Johnson*, *supra*, 19 Cal.App.4th at pp. 786–791; see also *People v. McDowell* (2012) 54 Cal.4th 395, 426–427 [discussing *Johnson*].) We reach the same conclusion here.

During the guilt phase, Masters sought to introduce the testimony of John Irwin, a sociologist who studied prison culture and prison social organizations. Outside the presence of the jury, defense counsel made an offer of proof that Dr. Irwin could describe what prison life was like. Dr. Irwin would testify that prisoners often create elaborate fantasies and embellish their accomplishments. Dr. Irwin would also testify that prisoners often falsely claim to have committed criminal acts and often provide to the authorities information about criminal acts committed by others in exchange for some sort of benefit. The trial court ultimately sustained the prosecutor's relevance objection to Dr. Irwin's proposed testimony, finding that the proffered evidence addressed only prison conditions generally and did not specifically relate to Masters, Johnson, Woodard, or any witness.

The trial court did not abuse its discretion in excluding Dr. Irwin's proffered testimony. The trial court did not doubt that Dr. Irwin possessed sufficient education or experience as to qualify as an expert in prison conditions, or that his knowledge of prison conditions was sufficiently beyond common experience. Rather, the trial court found that there was no logical connection between the proffered testimony and Masters's case. For example, the trial court stated that it did not see the relevance of Dr. Irwin's proffered testimony "unless he knows it for a fact that it was Mr. Masters who lied when he wrote [the report that incriminated him]." The trial court saw no relevance in Dr. Irwin's proposed testimony because it was too generalized and speculative, and did not demonstrate any tendency to prove that Masters had lied: "We're not having a sociological study in this courtroom about what happens in prisons."

As the trial court correctly noted, Masters failed to link Dr. Irwin's proffered testimony to any of the defendants. Although the proffered testimony referred to prison conditions generally, it did not establish that Dr. Irwin had reviewed the

specific facts of the case and had formed an opinion about it. The trial court did not abuse its discretion in finding the link between Dr. Irwin's proffered testimony and Masters's case too speculative.

Masters's reliance on *People v. McDonald* (1984) 37 Cal.3d 351 is misplaced. In *McDonald*, the defendant proffered expert psychological testimony about the reliability of eyewitness identification, which the trial court excluded. (*Id.* at p. 361.) We held that the trial court had abused its discretion because the eyewitness identification in that case was a key factor that was not substantially corroborated by other evidence, and the proffered testimony was not likely to be fully known or understood by the jury. (*Id.* at p. 377.) *McDonald* does not help Masters because the expert in that case had reviewed the various eyewitnesses' identification and intended to highlight psychological factors that might have affected their specific identifications. (*Id.* at p. 362.) Here, by contrast, Masters's proffered testimony failed to indicate any particular factors that tended to prove that he, Johnson, or Woodard had falsely admitted to participating in Sergeant Burchfield's murder.

Masters contends that the trial court's ruling implied that Dr. Irwin could not testify unless he offered an opinion as to the credibility of a particular witness, which likely would have invaded the province of the jury. But that is not a necessary implication of the trial court's ruling. The trial court simply determined that the proffered testimony did not indicate any specific factors associated with any person involved with the case and would have invited the jury to speculate based on generalized notions about prison conditions.

To the extent Masters contends that Dr. Irwin was an expert in gang sociology and therefore should have been permitted to testify on that basis, the proffered evidence did not demonstrate that Dr. Irwin had specialized knowledge or experience with the BGF or any other gang associated with the case.

46

Finally, Masters notes that Dr. Irwin was permitted to testify as an expert in prison culture and conditions in *People v. Ayala* (2000) 23 Cal.4th 225, 293–294. In *Ayala*, however, Dr. Irwin testified during the penalty phase; the conditions of that defendant's confinement were plainly relevant to his case in mitigation. The relevance of such evidence at the guilt phase is another matter. And, as noted, Dr. Irwin did testify on Masters's behalf during the penalty phase.

## C. Exclusion of Evidence of Another Prison Gang's Possible Involvement in the Murder

Masters contends that the trial court abused its discretion by excluding evidence that implied that Crips members actually murdered Sergeant Burchfield.

### 1. Anonymous Note

Defense counsel sought to examine a correctional officer about various notes found in the prison that claimed responsibility for Sergeant Burchfield's murder. These notes were turned over to the prison's investigators but were apparently lost. Outside the presence of the jury, the officer testified that he recalled one such note was found in a section of the prison different from where Sergeant Burchfield was murdered. Its opening salutation was "cuz," which was a term predominantly used by Crips members to refer to each other. The note said, in pertinent part, "We killed the dog," which the officer understood to refer to Sergeant Burchfield's murder. The officer also saw at least 10 other notes claiming responsibility for Sergeant Burchfield's murder.

The trial court precluded the officer from testifying about the note, finding that its author and origins were unknown and that it might have been written merely to confuse the investigation.

Although the precise legal basis for the trial court's ruling is unclear from the record, the court did not abuse its discretion in excluding evidence of this note. As an out-of-court statement offered for the truth of the matter it stated, the contents

47

of the note were hearsay, which generally is inadmissible. (Evid. Code, § 1200.) Masters argued in the trial court that evidence of the note was nonetheless admissible as a declaration against the author's penal interest. (See *id.*, § 1230.) As the trial court observed, however, the note's author and origins were unknown, so the note lacked sufficient indicia of reliability as to be admissible on that basis.

To the extent Masters contends that the 10 notes were circumstantial evidence that prisoners often falsely admit to crimes they did not commit, there was no evidence establishing the author's identity. And, as discussed previously with respect to the proffered expert testimony, generalized evidence that prisoners sometimes lie would have been too speculative to be admissible. (See Evid. Code, § 210.)

### 2. *Slain Crips Member*

Some Crips members believed that prison staff had helped a rival gang kill one of its members named Montgomery. As noted, immediately after Sergeant Burchfield's murder, someone yelled, "Let's get another one for Montgomery."

Defense counsel sought to examine a correctional officer about whether Montgomery had been a leader in the Crips. The trial court twice sustained the prosecutor's objections that the defense had failed to establish an adequate foundation for the questions. The officer eventually testified that sometime after Sergeant Burchfield's murder he had "heard" Montgomery had been a leader in the Crips. Defense counsel asked the officer if he knew as of the time of the trial whether Montgomery was a Crips leader, but the trial court sustained the prosecutor's relevance objection.

Even if we were to assume the trial court's rulings were an abuse of discretion, Masters cannot show prejudice because the officer testified that he heard Montgomery had been a leader in the Crips, and no contrary evidence was

48

presented. Willis also testified Crips members had expressed a desire to murder a correctional officer as revenge for Montgomery's death. That the court's ruling prevented the officer from testifying whether he *knew* Montgomery was a leader of the Crips did not prevent Masters from arguing that Crips members had the opportunity and motive to murder Sergeant Burchfield. Nor was the weight of the evidence significantly diminished by the lack of confirmation of Montgomery's undisputed status as a leader in the Crips.

### D. Admission of Evidence of the BGF's Philosophy

Masters contends that the trial court abused its discretion in admitting evidence of the BGF's "extremist, violent and revolutionary" philosophy.

The prosecutor sought to introduce into evidence material related to the BGF's membership, organization, customs, and practices. The trial court ultimately permitted the prosecutor to introduce more than 20 documents, some which were redacted before being provided to the jury. As noted, Willis also testified as an expert about the BGF.

"A trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will be unduly prejudicial. ([Evid. Code], § 352.) 'Prejudice,' as used in Evidence Code section 352, is not synonymous with damaging. [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial." (*McCurdy*, *supra*, 59 Cal.4th at p. 1095.)

Masters extensively litigated at trial the introduction of this evidence and on appeal asserts in a footnote that "in particular" 25 exhibits "were erroneously admitted." These exhibits consist almost entirely of notes written or possessed by Masters, Johnson, Woodard, Evans, or other BGF members.

49

Masters's broad assertion that all of these documents were "irrelevant but highly inflammatory" is not supported by argument or authority, and he articulates specific challenges to only a few pieces of evidence as "representative of the inflammatory content of the documents." Notwithstanding his objections at trial to specific documents on various grounds, we are hesitant to consider on appeal Masters's conclusory assertion that *all* of the gang-related evidence was irrelevant and unduly prejudicial. (See *People v. Booker* (2011) 51 Cal.4th 141, 171 (*Booker*) [declining to "hazard a guess" for the basis of the defendant's claim on appeal when around 100 photographs were admitted into evidence at trial].)

Masters expressly challenges the admission of a note in his handwriting that described a violent philosophy of the "black underclass"; a handwritten document found in Johnson's cell entitled "Organizational Structure"; a handwritten note in Woodard's possession that discussed a race-based revolution; and a typewritten document in Woodard's possession entitled "Subject: Ideology." The trial court did not abuse its discretion in admitting this evidence because, if believed, they tended to prove the intent and motive of Masters, Johnson, or Woodard. These exhibits, while damaging to Masters, were not unduly prejudicial because they were directly related to the legal issues raised in his trial and did not tend to evoke an emotional bias against him.

Even if we were to assume that Masters has not abandoned on appeal his challenge to the remaining evidence, his contention would lack merit because our independent review of the admitted exhibits reveals no reversible error. As explained below, much of the evidence relating to the BGF's philosophy was relevant to demonstrate the existence and motive of the conspiracy to attack Sergeant Burchfield and was not unduly prejudicial.

In *People v. Roberts* (1992) 2 Cal.4th 271, 299, we held that the trial court did not abuse its discretion in admitting evidence of BGF activity to which the

defendant had no connection. We held that "[t]he court did not abuse its discretion in permitting the prosecution to explore the nature of prison-gang life in order to elucidate its theory of the case, at least insofar as such testimony was necessary to furnish the jury a context for understanding that theory." (*Ibid.*) Here, although Masters offered to stipulate that he was a member of the BGF, thereby eliminating the need to prove that fact, the prosecutor was still required to demonstrate the existence of the conspiracy to murder Sergeant Burchfield and Masters's role in the conspiracy. (Cf. *Booker*, *supra*, 51 Cal.4th at p. 171 [a prosecutor cannot be forced to accept a stipulation that deprives the state's case of its persuasiveness].) The BGF's beliefs were relevant evidence of its members' motivation to form the conspiracy. For example, Willis testified that Willie Redmond said he "wanted to start a war by striking, start it off by striking police." And the material introduced by the prosecutor, if believed, tended to prove that the BGF's violent philosophy was consistent with the conspiracy that Masters and others had formed.

The trial court made a painstaking effort to exclude evidence of the BGF's beliefs that were irrelevant or unduly prejudicial. For example, the trial court excluded evidence concerning events from the 1970s in which African American prisoners at San Quentin attacked prison and court staff.

Even if we were to assume that the trial court improperly admitted some evidence related to the BGF that should have been excluded, Masters cannot establish that a more favorable outcome would have been reasonably probable had some of this evidence been excluded. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Other, properly admitted evidence established the existence of the conspiracy and Masters's role within it. For example, Willis testified about the planning meetings he had with Masters and other BGF members; Evans testified that Masters had

51

admitted he voted in favor of the plan to murder Sergeant Burchfield; and a note in Masters's handwriting detailed the attack.

To the extent Masters contends that evidence concerning the BGF violated his First Amendment rights to free speech and association, we are not persuaded. Because Masters's membership in the BGF was relevant to the issues in his case, the introduction of this evidence did not impermissibly burden his First Amendment rights. (See *People v. Bivert* (2011) 52 Cal.4th 96, 117–118.)

### E. Nondisclosure of Evidence of Witness Bias

Masters contends that the prosecutor failed to fully disclose the benefits Bobby Evans received in exchange for his testimony. Masters also contends that the trial court abused its discretion by not allowing him to reopen his case to further examine Evans about this subject.

As noted, Evans testified that Masters, Johnson, and Woodard admitted to him their respective roles in the conspiracy to murder Sergeant Burchfield. Evans testified that Masters voted in favor of the plan to murder Sergeant Burchfield. Evans did not testify under a grant of immunity.

At trial, Evans admitted he was awaiting sentencing in Alameda County after pleading guilty to attempted robbery in exchange for a sentence of "no more than 16 months state prison time," and that 16 months was "a solid figure." He testified that because he had committed this crime while on parole, his parole had been revoked, and he agreed to serve an additional year on his underlying sentence for violating his parole. After Evans had pleaded guilty, he contacted James Hahn, a parole agent for the Department of Corrections, and offered to disclose information in exchange for protection from the BGF. Agent Hahn made no guarantees but said he might be able to do a favor for Evans "sometime down the line."

52

Evans testified that in an effort to reduce the amount of time he would serve in prison, he wanted to spend as much time as possible before sentencing in local custody: "I'm [going to] put my sentence off until the time runs out. [¶] . . . [¶] The time has almost ran out now so whatever happens after that, happens." Evans's sentencing hearing had been repeatedly postponed. He denied that anyone from the Department of Corrections had spoken to his sentencing judge. Evans testified that he did not anticipate receiving anything for testifying, including a reduction in his pending sentence. Even if with good-time and work-time credits, due to the parole violation, Evans anticipated that he had around six more months to serve.

Around two months later, during jury deliberations, Masters learned that after Evans had testified, he had been granted probation at his sentencing hearing. Masters, Johnson, and Woodard moved to reopen to present evidence of Evans's sentence.

Outside of the jury's presence, the trial court conducted an evidentiary hearing at which it heard testimony from Evans's attorney, Agent Hahn, and Alameda County Deputy District Attorney William Denny, who had been assigned to prosecute Evans's attempted robbery case. Under the terms of Evans's plea bargain, he was to serve his sentence for the attempted robbery conviction and parole violation concurrently. Agent Hahn stated that before the start of Masters's trial, he had made no promises to Evans other than that the Department of Corrections would "take care of his safety and security." The prosecutor in Masters's case had told Denny that no promises would be extended in exchange for Evans's testimony.

Evans's attorney had expressed concern about Evans's safety to the Alameda County sentencing judge. Evans had expressed concern for his safety to Agent Hahn. Agent Hahn had told Evans that it would be possible for Evans to serve his

53

time outside of California.  Agent Hahn told Evans he would attempt to postpone his sentencing hearing so that he would not be sent to state prison.

Neither Denny nor the sentencing judge had made any representations to Evans concerning his testifying against Masters.  Denny, however, testified that Alameda County Deputy District Attorney's Office had an unwritten policy to come to a generalized understanding regarding a defendant's testimony, "but not really word it specifically . . . until after the testimony"; "[t]he better practice [was] not to make a deal before testimony."  Agent Hahn and Alameda County Deputy District Attorney Russell Giuntini had asked Denny to delay the sentencing hearing; Agent Hahn made the request specifically to delay Evans's commitment to state prison.  In a letter to Evans's sentencing judge, the prosecutor in Masters's case stated that his office had not made a deal for Evans's testimony.

Eventually, Giuntini told Denny to suggest that the Alameda County court sentence Evans to credit for time served because he was "close to release anyway on a 16-month state prison sentence."  At his sentencing hearing, Evans received credit for "something like" 203 days of actual custody and was placed on probation for three years.  Because of the parole violation, Evans remained in the local jail.  After Evans testified, Agent Hahn requested that Evans be released from custody for the remainder of his sentence for the parole violation.  Shortly thereafter, Evans was released from jail to Agent Hahn's custody.

In an in camera hearing, Evans's attorney testified that Evans did not seem concerned by the possibility that he might have to return to state prison.  Evans had told his attorney that he believed his sentences for both the crime and the parole violation would "be taken care of."  The trial court estimated that if Evans had been sentenced to 16 months, and after accounting for various credits, he still would have had to have serve around four more months in prison.

In ruling on the motion to reopen, the trial court found that Agent Hahn's assurances to Evans, for the most part, had been disclosed to Masters before the start of trial. The trial court found that to the extent assurances regarding Evans's safety and postponing his sentencing hearing were not disclosed before the start of trial, they were effectively disclosed during Evans's testimony. The court reasoned that Evans's desire for safety and the repeated postponement of his sentencing hearing led to the conclusion that the postponements were occurring to satisfy Evans's safety concerns. Because Masters failed to demonstrate that any promises were made to Evans that not had been previously disclosed or revealed at trial, the court denied Masters's motion to reopen his case.

On appeal, Masters first contends the prosecutor failed to disclose to him the benefits Evans received in exchange for his testimony. " 'In *Brady* [*v. Maryland* (1963) 373 U.S. 83], the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " [Citation.] In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 175 (*Letner and Tobin*).) As such, the prosecutor has a duty to "disclose to the

55

defense and jury any inducements made to a prosecution witness to testify and must also correct any false or misleading testimony by the witness relating to any inducements." (*People v. Phillips* (1985) 41 Cal.3d 29, 46.)

For a defendant to obtain relief under *Brady*, " ' "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." [Citation.] Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt and innocence." [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction "more likely" [citation], or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation]. A defendant instead "must show a 'reasonable probability of a different result.' " [Citation.]' [Citation.] We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence. [Citation.]" (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 176.)

Nothing in the record before us indicates that the prosecutor personally knew of any agreement between Evans and Agent Hahn. But because the prosecutor had a duty to learn of any possible inducements made by law enforcement officers or other agents of the state, we consider this information to be in the prosecutor's possession for *Brady* purposes.

The record indicates that Evans and Agent Hahn entered into an agreement in which Evans agreed to provide information in exchange for efforts to keep him safe, that is, to not return him to state prison. Evans pleaded guilty to obtain a relatively short prison term, and Agent Hahn took steps to postpone his actual sentencing, which resulted in Evans serving his sentence in the relative safety of

the Alameda County jail. As part of that plan, Agent Hahn also took steps to rescind the sentence for Evans's parole violation, which also prevented Evans from returning to state prison.

Agent Hahn did not personally contact Evans's sentencing judge, but Agent Hahn did contact Denny, who acted in conformity with the agent's requests. Although Agent Hahn never promised Evans specific results, he did promise to make efforts that would benefit Evans and in fact did make such efforts. By the time Evans testified at Masters's trial, Evans's sentencing hearing had twice been postponed, which presumably led Evans to believe that Agent Hahn had kept his end of the bargain.

Masters correctly notes that the jury never heard about Evans's early release. The issue before us, however, is whether the omissions by Evans and Agent Hahn were material, that is, whether there was a reasonable probability of a different result had the full extent of the agreement been disclosed to Masters. Notably, the prosecutor disclosed to Masters before the start of trial that the Department of Correction had agreed to "take care" of Evans's "safety and security." At trial, Evans, a convicted felon, acknowledged that he had offered information about the BGF in exchange for the hope of receiving "a favor." Evans testified that his plan was to maximize his time in the Alameda County jail to avoid being exposed to BGF members in state prison and that the repeated postponement of his sentencing hearing was in conformity with his plan. Thus, the gist of the agreement — information in exchange for safety — was known to Masters and heard by the jury.

Moreover, Evans testified that he agreed to be sentenced to *no more than* 16 months for both the attempted robbery and parole violation. The shorter sentence actually imposed on Evans was consistent with the terms of his original plea bargain and therefore did not necessarily represent a benefit outside the

57

bounds of his anticipated sentence. Accordingly, Evans's release from jail did not materially alter what the jury already knew about his inducement to testify.

Evans's testimony served only to confirm Willis's testimony. In addition, Evans's credibility was thoroughly attacked at trial, and the jury was well aware of his other criminal acts in addition to his attempted robbery conviction. We also observe that the jury learned of the particulars of the omitted evidence at the penalty phase and reached a death verdict despite its ability to consider lingering doubt as a mitigating factor. (See § 190.3, factor (k).) Accordingly, additional evidence of the benefits Evans received was not material to the guilt verdict.

Masters also contends that the trial court abused its discretion by denying his motion to reopen his case to permit him to present this additional evidence concerning Evans's testimony. "A 'motion to reopen [is] one addressed to the [trial] court's sound discretion.' [Citation.] In determining whether an abuse of discretion occurred, the reviewing court considers four factors: ' "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." ' [Citation.]" (*Homick*, *supra*, 55 Cal.4th at p. 881; see §§ 1093, 1094.)

As noted, the trial court ruled that the benefits Evans received were either disclosed before the start of the trial or revealed during it. Even if we were to assume that Masters had been diligent in investigating and presenting evidence of the benefits Evans received, the additional evidence of the agreement was not so significant that we may conclude the trial court abused its broad discretion by declining to reopen the case during jury deliberations. As discussed, the prosecutor disclosed to Masters before the start of his trial that the Department of Corrections had assured Evans that it would take care of his safety. Evans

58

testified that he sought to avoid returning to state prison and that the repeated postponements of his case caused that to happen. In addition, Evans's criminal history gave the jury ample reason to question his credibility and motivations. Evans's testimony was not the only evidence of Masters's guilt: Willis also implicated him. Masters also implicated himself by writing at least one note that admitted his participation in the conspiracy to murder Sergeant Burchfield. Thus, the additional evidence presented at the evidentiary hearing was not materially different than what the jury already knew.

### F. Recess During Jury's Deliberations

Masters contends that the trial court erred by adjourning for nine court days during the winter holidays. The Court of Appeal rejected a similar contention regarding the adjournment in Johnson's and Woodard's appeals. (*Johnson*, *supra*, 19 Cal.App.4th at pp. 791–794.)

Before the start of trial in August 1989, the trial court indicated its intent to be in recess after December 15, 1989 and to resume proceedings on January 2, 1990. Excluding weekends and holidays, the court intended to be in recess for nine court days. No party objected. The trial court informed the jury of its plan. As it became apparent that the presentation of evidence would be finished before the start of the recess, the defense said it was "a little bit concerned" about the possibility that the parties might make their closing arguments before the recess but the court might not instruct the jurors until after it. On December 1, the trial court affirmed its plan to be in recess after December 15; Masters did not object. Following argument and instruction, the case was submitted to the jury on December 7. The jury deliberated until December 15 and was in recess over the holidays as planned. Deliberations resumed after the New Year's holiday.

The Attorney General contends this claim is forfeited on appeal. We agree; Masters failed to object at trial to the recess. (See *People v. Gray* (2005) 37 Cal.4th 168, 226 [citing *Johnson*, *supra*, 19 Cal.App.4th. 778]; *People v. Bolden* (2002) 29 Cal.4th 515, 561–562 (*Bolden*) [same]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1162 (*Gutierrez*) [same].) Masters did express concern about the recess separating the arguments from the instructions, but he did not object to the recess itself. The length of the recess under these circumstances did not excuse him from objecting. (See *Gray*, *supra*, 37 Cal.4th at p. 226 [338-day hiatus between guilt and penalty phases].)

Even if we were to consider this contention on the merits, we are not persuaded the trial court abused its discretion. The trial court's decision to be in recess during the traditional holiday period was announced well in advance so the court, the parties, and the jurors could plan accordingly. Altering the schedule likely would have caused hardship for at least some of the jurors. The court repeatedly admonished the jury not to consider the case outside of deliberations. Moreover, Masters has not established any possibility that the break in deliberations was prejudicial. (See *Bolden*, *supra*, 29 Cal.4th at pp. 561–562 [no prejudice in the jurors not deliberating for six court days during the December holiday period]; *Gutierrez*, *supra*, 28 Cal.4th at p. 1162 [no prejudice in eight-court-day recess during deliberations].)

## IV. PENALTY PHASE ISSUES

### A. Denial of Motion for a New Jury or to Reopen Voir Dire

As noted, Masters and Woodard were tried jointly during the guilt phase, but Masters's penalty phase trial was conducted after Woodard's. Before the start of his penalty phase, Masters moved for a new jury or, in the alternative, to reopen voir dire so the parties could assess the jury's ability to impartially consider the

60

evidence to be presented against him in light of the evidence it had heard concerning Woodard. The trial court denied the motion, and Masters contends that it abused its discretion in doing so.

Section 190.4, subdivision (c) expresses a legislative preference for the same jury to hear the guilt and penalty phases of a joint trial. (See *Letner and Tobin*, *supra*, 50 Cal.4th at p. 196.) However, "[t]he trial court must exercise its broad discretion to resolve motions to sever the penalty phases of jointly tried codefendants [citation] in a manner consistent with 'the need for individualized consideration as a constitutional requirement in imposing the death sentence.' [Citations.]" (*Ibid.*)

The trial court twice instructed the jurors not to consider the evidence they had heard during Woodard's penalty phase trial when they were determining Masters's penalty. Absent evidence to the contrary, and Masters provides none, we presume the jurors followed these instructions. (See *Letner and Tobin*, *supra*, 50 Cal.4th at pp. 196–197.) Because nothing in the record indicates that the jurors were unable or unwilling to independently assess Masters's culpability, we cannot say the trial court abused its discretion in trying the penalty phases in the manner in which it did. (See *id.* at p. 197; *People v. Kraft* (2000) 23 Cal.4th 978, 1069–1070 (*Kraft*) [psychologist's opinion that the guilt phase jury would be less able than a newly selected jury to give the defendant a fair trial did not compel empaneling a new jury].)

To the extent Masters contends that the similarities between Sergeant Burchfield's murder and the evidence of him killing David Jackson were so prejudicial that the trial court was required to empanel a new jury for the penalty phase, we are not persuaded. (See *People v. Catlin* (2001) 26 Cal.4th 81, 113–115 [ruling the legislative preference for a single jury was not inherently unfair, even in a prior-murder special-circumstance capital case].) Even if we were to assume

61

that similarities between the guilt phase evidence and the evidence in aggravation could compel empaneling a new jury in some circumstances, a new jury in this case would have been instructed that Masters had been convicted for his role in Sergeant Burchfield's murder, and the prosecutor would have been allowed to present at least some evidence of the circumstances of that murder under section 190.3, factor (a). (See *Kraft*, *supra*, 23 Cal.4th at pp. 1069–1070.)

Similarly, we reject Masters's contention that the trial court abused its discretion by not permitting further voir dire after the conclusion of Woodard's penalty phase trial. Nothing in the record indicates that the jury could no longer remain impartial after Woodard's penalty phase trial. (See *People v. Clark* (2011) 52 Cal.4th 856, 966.) To the extent Masters contends that jurors may have been exposed to media accounts of the trial, nothing in the record suggests that any juror was so exposed.

## B. Admission of Evidence Regarding Unadjudicated Offenses

Masters contends that the trial court abused its discretion in admitting evidence of his unadjudicated violent criminal activity.

Section 190.3, factor (b), allows the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." Evidence of a defendant's unadjudicated violent criminal activity may be admitted for the jury's consideration if there is substantial evidence to prove each element of the unadjudicated activity. (*People v. Tully* (2012) 54 Cal.4th 952, 1027 (*Tully*).) We review the trial court's decision to admit such evidence for abuse of discretion. (*Ibid.*)

Masters preliminarily contends that the admission of evidence of his unadjudicated violent criminal activity violated his federal constitutional rights but

62

concedes we have previously rejected this argument. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1232; *Tully*, *supra*, 54 Cal.4th at pp. 1029–1030.) To the extent he contends that remoteness in time or the expiration of the statute of limitations bars the admission of his unadjudicated violent criminal activity, we have also rejected this argument. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 42–43.)

Masters next contends that the evidence of his involvement in Bob Hamil's murder was not sufficient and therefore should have been excluded. Masters does not dispute that the evidence indicated that Hamil was robbed and murdered. Rather, he contends that the evidence did not implicate him in the crimes. Masters's statements, including that Hamil "was going to run after *us* and shoot at *us*," were substantial evidence that he participated in the crimes. Although the evidence of Masters's statements was arguably ambiguous or unreliable, it was sufficiently substantial and trustworthy to permit the jury to consider it when determining his penalty verdict. (See *People v. Edwards* (2013) 57 Cal.4th 658, 754.)

Masters also contends that there was not sufficient evidence linking him to David Jackson's murder. Again, he does not dispute that Jackson was murdered but instead attacks the evidence indicating that he was the perpetrator. The evidence, however, showed that Masters on multiple occasions admitted to stabbing Jackson. This is sufficient. Although Masters highlights the evidence indicating he did not stab Jackson as well as the evidence attacking the credibility of the prosecutor's witnesses, the weight of this evidence was for the jury to determine.

## C. Admission of Photographs of Victim David Jackson

Masters contends that the trial court abused its discretion by admitting two photographs of Jackson after he had been killed.

The prosecutor sought to introduce into evidence four photographs showing the wounds Jackson had suffered. Masters objected to the photographs as unduly prejudicial. In lieu of their introduction, Masters offered to stipulate to Jackson's identity and the nature of the wounds that he had suffered. The trial court permitted the prosecutor to present two of the photographs.

The photographs of Jackson depicted the nature and location of his wounds and were therefore relevant. (See *Booker*, *supra*, 51 Cal.4th at p. 187.) Masters contends that his proffered stipulation that Jackson was stabbed to death removed the relevancy of the photographs. But, as Masters concedes, a prosecutor cannot be forced to accept a stipulation that deprives the state's case of its persuasiveness. (See *id*. at p. 171.) Evidence of a defendant's violent criminal activity is relevant under section 190.3, factor (b), which includes evidence of the degree of violence employed. (*People v. Smith* (2003) 30 Cal.4th 581, 625–626; *People v. Wader* (1993) 5 Cal.4th 610, 655.)

Masters also contends that the trial court abused its discretion in admitting the photographs. "[T]he trial court's discretion to exclude photographs as unduly prejudicial during the penalty phase is even more circumscribed than . . . during the guilt phase" because the jury is expected to subjectively weigh the evidence. (*Booker*, *supra*, 51 Cal.4th at p. 187.) As noted, the trial court did exercise its discretion and excluded two photographs that depicted "gruesome looking wounds." We have reviewed the remaining two photographs, and we conclude that the trial court did not abuse its discretion in admitting them. (See *People v. Moon* (2005) 37 Cal.4th 1, 35 [" ' " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' " ' "].)

**D. Time Limits on Counsel's Arguments to the Jury**

Masters contends that the trial court abused its discretion in limiting his closing argument to 100 minutes.

"The right to present closing argument at the penalty phase of a capital trial, while broad in scope, 'is not unbounded . . . ; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark.' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 463; see § 1044 ["It shall be the duty of the judge to . . . limit the . . . argument of counsel to relevant and material matters . . . ."].)

The trial court initially said that it intended to allot a total of 210 minutes to closing arguments. The prosecutor requested "a little more time." The trial court stated that the jurors were "sophisticated" because they had just completed Woodard's penalty phase trial, and presumably were familiar with the applicable statutory aggravating and mitigating factors. The trial court then stated each side could argue for 90 minutes. The prosecutor requested a total of 240 minutes, but the trial court denied the request. Defense counsel argued for 36 minutes before the trial court excused the jury for that day's noon recess. Before argument resumed, the defense requested "at least an hour" for the remainder of his argument and added, "We object to the time limitation to begin with." The trial court granted the defense 10 additional minutes, for a total of 100 minutes. After the recess, defense counsel's argument resumed. Toward the end of his argument, defense counsel asked how much time he had remaining, and the trial court replied, "two minutes." Defense counsel finished without being interrupted or otherwise cut off. Following the noon recess, defense counsel had argued for around 68 minutes. Thus, defense counsel argued to the jury for around 104 minutes in total, approximately 14 minutes more than the court's initial allotment of 90 minutes.

65

The Attorney General preliminarily contends that Masters did not preserve this issue for appeal because he did not object at trial. Masters contends that his midargument objection did preserve this issue for appeal and, in the alternative, that the trial court's adverse rulings to the prosecutor's prior objections rendered further objections futile. Masters's contention is doubtful. The prosecutor first requested "a little more time" and then 120 minutes for argument. The defense said nothing. Thus, if defense counsel desired more than 120 minutes for closing argument, nothing before the trial court would have alerted it to his desire. During argument, defense counsel requested and received 10 additional minutes. As the defense had 54 minutes remaining in the afternoon to argue, the trial court's grant of 10 additional minutes satisfied his request for "at least an hour" to finish his argument. At most, therefore, Masters has preserved for appeal the claim the trial court abused its discretion in not granting him 16 more minutes for argument (to bring the total argument to 120 minutes).

During the penalty phase, dozens of witnesses testified over several weeks about various aspects of Masters's life, and the jury heard evidence concerning numerous prior robberies and two unadjudicated murders. But after examining the circumstances of this case, we cannot say the trial court abused its discretion. In *People v. Keenan* (1859) 13 Cal. 581, 584, we held that the trial court abused its discretion in a capital murder case when it limited argument from the defendant's two counsel to 90 minutes each, stopped one of the attorneys when time had expired, and then denied the defendant's request for additional time. Unlike in *Keenan*, Masters did not request additional time once he reached the end of his 100 minutes. The trial court permitted him to argue for around 104 minutes. In addition, *Keenan* was decided well before the use of a bifurcated trial in capital cases. Unlike the defendant in *Keenan*, Masters was able to focus his argument on mitigation, as the jury had already heard his guilt phase argument.

66

Similarly, in *People v. Stout* (1967) 66 Cal.2d 184, 200, we held that there was no abuse of discretion where the trial court limited argument to two hours per side and the defendant's first objection to the time limits was raised in his motion for a new trial. As noted, Masters did not actually interpose an objection to the court's time limits until he had partially completed his argument.

When determining whether the trial court abused its discretion, other jurisdictions have also examined whether the defendant explained what additional arguments counsel wished to make. (E.g., *Lewis v. State* (Miss.Ct.App. 2002) 814 So.2d 819, 831–832 [at the end of the trial court's time limit, the defendant objected and proffered the remainder of his argument]; *Wyatt v. State* (Tex.Crim.App. 2000) 23 S.W.3d 18, 29 [finding forfeited the defendant's claim of inadequate time for closing argument when counsel used less than the time allotted, did not request additional time, and did not identify matters that he was unable to argue]; see also *Weaver v. Chandler* (Ohio Ct.App. 1972) 287 N.E.2d 917, 920–921 [no error in a civil case where the defendant chose to waive argument in the face of the trial court's time limits].)

In any event, even if we were to assume that the trial court abused its discretion, its time limits did not prejudice Masters. (See *People v. Bonin* (1988) 46 Cal.3d 659, 695 [no prejudice when the trial court precluded second counsel from presenting a closing argument after lead counsel had presented a "full and unrestricted" argument].) Masters contends on appeal that the trial court's time limits truncated his arguments regarding Hamil's and Jackson's unadjudicated murders. The record before us, however, indicates that Masters's argument did address the two unadjudicated murders. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184–1185 [ruling no abuse of discretion occurred because the defendant was not foreclosed from making any arguments].) Other than his generalized statements, Masters presents nothing to establish that trial counsel

67

wanted to make (and could have made) a more persuasive argument that might have affected the outcome.

## V. OTHER ISSUES

### A. Challenges to the Death Penalty

Masters mounts a number of challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no persuasive reason for us to reexamine those conclusions.

"[W]e have repeatedly held that 'CALJIC No. 8.88 provides constitutionally sufficient guidance to the jury on the weighing of aggravating and mitigating factors.' [Citations.] We have rejected the claim that the instruction unconstitutionally fails to inform the jury that, in order to impose the death penalty, it must find that aggravating circumstances outweigh mitigating ones beyond a reasonable doubt. [Citation.] Under our precedent, 'the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase.' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 294 (*Williams*).)

" 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty. [Citations.] This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296.' [Citations.]

68

"Review for intercase proportionality is not constitutionally compelled. [Citations.]

"Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. [Citations.]" (*Williams*, *supra*, 58 Cal.4th at p. 295.)

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment. [Citations.]" (*Williams*, *supra*, 58 Cal.4th at pp. 294–295.)

" '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court.' [Citation.] We further 'reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death.' [Citations.]" (*People v. Maciel* (2013) 57 Cal.4th 483, 552–553 (*Maciel*).)

" 'Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is constitutional.' [Citation.]" (*Maciel*, *supra*, 57 Cal.4th at p. 553.)

"Prosecutorial discretion in the decision whether to seek the death penalty in a given case does not render the law unconstitutionally vague or arbitrary. [Citation.]

"Justice Blackmun's dissent from the high court's denial of certiorari in *Callins v. Collins* (1994) 510 U.S. 1141, does not convince us that the death penalty is so arbitrary or unreliable as to constitute cruel and unusual punishment in violation of the Eighth Amendment. [Citation.] Similarly, the increasing barriers to postconviction relief in state and federal courts, as outlined by Justice

69

Blackmun in his concurring opinion in *Sawyer v. Whitley* (1992) 505 U.S. 333, 357–360, do not provide a basis for relief on direct appeal. [Citations.]

"The slow pace of executions in California, which defendant contends is similar to the conditions condemned by Judge Noonan in his dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425–427, does not render our system unconstitutionally arbitrary. [Citations.]

"The alleged inconsistency between regular imposition of the death penalty and international norms of human decency does not render that penalty cruel and unusual punishment under the Eighth Amendment [citation]; nor does 'regular' imposition of the death penalty violate the Eighth Amendment on the ground that ' "[i]nternational law is a part of our law" ' [citation]. To the extent defendant contends the errors and due process violations that occurred at his trial also violate international law, his claim fails because we have found no such errors or due process violations. International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 654.)

" 'Defendant was not entitled to an instruction regarding a presumption of life.' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 150.)

"We also have rejected repeatedly the contention that the absence of an instruction concerning the meaning of a sentence of life imprisonment without the possibility of parole violates a defendant's federal constitutional rights . . . ." (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 207.)

" '[D]efendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants.' " (*People v. Vines* (2011) 51 Cal.4th 830, 890.)

70

"The delay between sentence and execution does not violate the federal or state Constitution. [Citation.]" (*Booker*, *supra*, 51 Cal.4th at p. 197.)

"[A] challenge to the method of a future execution is not cognizable on appeal, because such a claim does not impugn the validity of the judgment. [Citations.]" (*People v. Burney* (2009) 47 Cal.4th 203, 270.)

## B. Asserted Denial of Opportunity to Present a Defense and Cumulative Error

Masters contends that the cumulative effect of the errors during his trial mandates reversal. But even assuming that the magistrate erred by denying Masters's request for a pretrial lineup and by denying him the opportunity to confront Willis about Masters's physical characteristics, that the trial court abused its discretion in sustaining the prosecutor's relevancy objection concerning Montgomery's status as a leader in the Crips, that the trial court abused its discretion in admitting some BGF evidence, and that the trial court abused its discretion in limiting Masters's penalty phase argument to 100 minutes, there is no reasonable possibility that the jury would have reached a different result at the guilt or penalty phase absent any or all of the assumed errors.

We are mindful of Masters's claim that the trial court's rulings, even if correct, nonetheless violated his due process right to present his principal defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683; *Chambers v. Mississippi* (1973) 410 U.S. 284; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law"]; cf. *Nevada v. Jackson* (2013) 569 U.S. __ [133 S.Ct. 1990, 1992] ["Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. [Citations.]"]; *Holmes v. South Carolina* (2006) 547 U.S. 319, 326 [holding federal Constitution prohibits exclusion of defense evidence under rules

71

that are disproportionate to the ends they assertedly promote or serve no legitimate purpose, but otherwise reaffirming constitutionality of well-established evidentiary rules]; *People v. Jones* (2013) 57 Cal.4th 899, 957 [routine application of evidentiary rules does not implicate a criminal defendant's constitutional rights]; *People v. Butler* (2009) 46 Cal.4th 847, 866–867 [unreliable statements excludable under state law are also excludable under the federal Constitution].)

Specifically, Masters contends that he was not involved in the conspiracy to murder Sergeant Burchfield and that the trial court erred by not allowing him to challenge Willis's identification of him, to introduce statements that implicated only Johnson or Woodard, or to introduce evidence that implicated the Crips gang. But Masters had the ability to impeach, and did impeach, the evidence that identified him as a participant in the conspiracy. Masters also had the opportunity, and took advantage of the opportunity, to attack Evans's credibility. And Masters had the opportunity to present evidence, and did present evidence, that others might have conspired to murder Sergeant Burchfield. Thus, the trial court's rulings did not completely preclude him from pursuing the defense that he was wrongly accused. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1183–1184 [exclusion of proffered expert testimony did not necessarily exclude other evidence concerning circumstances of the defendant's admissions].)

**CONCLUSION**

We affirm the judgment.

LIU, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
CUÉLLAR, J.
KRUGER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Masters

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S016883
**Date Filed:** February 22, 2016

_____

**Court:** Superior
**County:** Marin
**Judge:** Beverly B. Savitt

_____

**Counsel:**

Law Office of Joseph Baxter, Joseph Baxter; Baxter Law Offices, Sara Baxter; Law Office of Richard I. Targow, Richard I. Targow, Jeanette L. Lebell; Andrian & Gallenson and Chris P. Andrian for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Gerald A. Engler, Chief Assistant Attorneys General, Jeffrey M. Laurence, Assistant Attorney General, Ronald S. Matthias, Glenn R. Pruden and Alice B. Lustre, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joseph Baxter
Law Office of Joseph Baxter
645 Fourth Street, Suite 205
Santa Rosa, CA  95404
(707) 544-1149

Alice B. Lustre
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1167