Filed 2/5/26  P. v. Bloxton CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B339243 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. MA083915 |
| JODECI BLOXTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

Maggie Shrout, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant-appellant Jodeci Bloxton of five counts of first degree ATM robbery, five counts of assault with a semiautomatic firearm, and one count of possession of a firearm by a felon. The jury also found firearm allegations true on the robbery and assault charges. In a bifurcated proceeding, the trial court found that Bloxton sustained two prior strike convictions. The trial court sentenced him to 145 years to life plus 16 months in state prison.

Bloxton raises two arguments on appeal. First, he argues that the trial court prejudicially erred when it refused to allow him to reopen his case and testify, even though he had explicitly waived his right to testify, and the trial court had already instructed the jury. Second, he contends that his trial counsel was prejudicially ineffective by not requesting that the trial court dismiss four of his firearm enhancements under Penal Code section 1385, subdivision (c)(2)(B).[1] We reject these contentions and affirm the judgment.

---

[1] All undesignated statutory references are to the Penal Code. Section 1385, subdivision (c)(2), provides that a sentencing court "[i]n exercising its discretion" to dismiss a sentencing enhancement "shall consider and afford great weight to evidence offered by the defendant to prove" certain enumerated mitigating circumstances, and "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

## PROCEDURAL BACKGROUND

In 2023, a jury convicted Bloxton of possession of a firearm by a felon (§ 29800, subd. (a)(1); count one); five counts of first degree automated teller machine robbery (§ 211; counts two, four, six, eight, and ten); and five counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts three, five, seven, nine, and eleven). The jury also found that Bloxton personally used a semiautomatic handgun in the commission of counts 2 through 11. The trial court found that Bloxton had sustained two prior strike convictions. (§§ 667, subds. (b)–(j), 1170.12, subds. (a)–(d).) The court sentenced him to 145 years to life plus 16 months in state prison. The court sentenced him to 16 months in state prison on count one. On each of the remaining 10 counts, the court sentenced him to 25 years to life under the Three Strikes law, plus a middle term of four years for each gun enhancement on each count. The court stayed sentencing under section 654 on the five assault counts (counts three, five, seven, nine, and eleven). Bloxton timely appealed.

## FACTUAL BACKGROUND
### Counts two through eleven

Between November 2021 and August 2022, two individuals robbed five different ATM repairmen at gunpoint as they worked on ATM machines in various locations throughout Los Angeles County.[2] Based on the evidence presented and stipulations by

---

[2] These five robberies involved Schools First Credit Union, Bank of America, Edwards Federal Credit Union, Chase, and Wells Fargo ATMs, respectively.

the parties, it appears that these individuals successfully robbed hundreds of thousands of dollars from those five ATM machines. Police eventually arrested Bloxton and Naima Straughter.[3]

Although none of the witnesses identified Bloxton as having committed any of the five robberies/assaults, extensive circumstantial evidence presented at trial indicated that Bloxton and Straughter were the individuals who robbed and assaulted the five ATM repairmen.[4]  For instance, the same gray Acura ILX was involved in the Schools First Credit Union, Bank of America, Edwards Federal Credit Union, and Chase ATM robberies.  That car's license plate was traced to Straughter, and Bloxton was driving the car on January 27, 2022, when police stopped him for a traffic violation.  Bloxton and Straughter were living together in the Lancaster apartment where police executed a search warrant.  Straughter had pictures of Bloxton and their dogs on her cell phone.  They both posted pictures and videos to social media of themselves with large amounts of money right after many of the robberies had occurred.

As part of their investigation into Bloxton and Straughter, officers had placed a GPS tracker on the Acura.  On September 22, 2022, the day officers arrested Bloxton and Straughter, they tracked the Acura to a Citibank ATM.  Surveillance video footage showed the Acura and a Dodge Challenger circling a strip mall

---

[3]     Straughter was charged with having committed counts two through eleven along with Bloxton but is not a party to this appeal.

[4]     None of the witnesses identified Bloxton as having committed any of the five robberies because, in each instance, the assailants either wore face masks or the victims could not see their faces.

where the Citibank ATM was being repaired by a technician. Bloxton and Straughter sent each other text messages that day about their location and the presence of police in the area. When the police stopped the Challenger that day, Bloxton was driving, and Straughter was the passenger. The police recovered a number of items from the Challenger and the Acura, including cell phones, face masks, gloves, dark clothing, hoodies, and a gun. The police also recovered a pair of brightly colored boxer shorts and a pair of shoes from Bloxton's home. The boxer shorts were similar to the ones worn by the suspect in one of the robberies, and the shoes matched ones worn by the gunman in another of the robberies. Boxton admitted to police that a Nike face mask, a pair of gloves, the shoes, and the gun recovered from the traffic stop belonged to him.

Data extracted from Bloxton's and Straughter's cell phones showed searches for such things as the location of broken ATMs, stories about ATMs being robbed, and stories about ATM repairman being robbed. Text messages between Bloxton and Straughter showed they were surveilling ATMs that were being repaired and would send a pin drop of the location of the ATM. On the day of the Wells Fargo ATM robbery, Straughter texted her location, which was at the bank, to Bloxton.

**Count one**

On August 19, 2022, around 11:00 p.m., Deputy Sheriff Nicholas Zimmer conducted a traffic stop on a black BMW in Lancaster. The basis for the stop was various Vehicle Code violations. Codefendant Straughter was the driver, and Bloxton was seated in the front passenger seat. Deputy Zimmer recovered a loaded semiautomatic handgun from underneath the

front passenger seat of the car.  The serial number of the gun had been scratched off.  Bloxton admitted to the deputy that the gun belonged to him.

## DISCUSSION

**I.** **The trial court did not abuse its discretion by denying Bloxton's late request to testify**

We reject Bloxton's contention that the trial court prejudicially abused its discretion by denying his request to testify, which came after he had waived his right to testify, and after the trial court had already instructed the jury.

### A. Relevant law

A criminal defendant has a fundamental constitutional right to testify in his own defense.  (*Harris v. New York* (1971) 401 U.S. 222, 230; *People v. Robles* (1970) 2 Cal.3d 205, 214–215.)  To exercise that right, however, the defendant must make "a timely and adequate demand to testify."  (*People v. Alcala* (1992) 4 Cal.4th 742, 805 (*Alcala*).)  "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' "  (*People v. Enraca* (2012) 53 Cal.4th 735, 762–763.)

A request to testify following the close of evidence, such as was made here, is deemed a motion or request to reopen the defense case, and may be granted upon a defendant's showing of good cause.  (See §§ 1093, 1094; *People v. Riley* (2010) 185 Cal.App.4th 754, 766.)  A trial court's decision to deny a

defendant's request to reopen a case in order to testify is reviewed for abuse of discretion. (*People v. Masters* (2016) 62 Cal.4th 1019, 1069 (*Masters*).) In determining whether the trial court abused its discretion, the reviewing court considers four factors: " ' "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." ' " (*Ibid.*)

### B. Background

Prior to the prosecution presenting its final witness, the trial court asked Bloxton if he had conferred with his attorney about whether he planned to testify. Bloxton stated that he had told his attorney that he wanted Straughter to testify. Defense counsel stated that, for tactical reasons, she was not going to call Straughter as a witness. Bloxton briefly spoke with counsel and informed the court that he was going to testify. The prosecution rested later that day.

After the prosecution rested, a recess was taken, then the trial court asked Bloxton whether he still planned to testify. The court noted that Bloxton had two prior convictions of moral turpitude, informed Bloxton that those prior convictions could be used to impeach him if he were to testify, and directed Bloxton to discuss the matter with his attorney. After Bloxton spoke with his attorney, counsel informed the court that Bloxton was going to exercise his right to remain silent. The following exchange occurred:

Court: Mr. Bloxton, have you had a chance to speak with your attorney regarding whether you want to testify or not?

Bloxton: Yeah.

Court: And at this time, Ms. Brown, does your client wish to testify in this case?

Ms. Brown: No, your honor. He is going to exercise his right to remain silent.

Court: And, Mr. Bloxton; is that correct?

Bloxton: (Nods head in the affirmative.)

COURT: Again, I want to make sure this is your decision, this is what you want to do. If you want to testify, you can. You have a right not to testify as well. The jury cannot use that against you.

So what is your decision at this time? Do you want to testify or do you not want to testify?

Bloxton: Nah.

COURT: You don't want to testify?

Bloxton: Uh-uh.

The jury returned, and the trial court instructed the jurors.

The following day, before the jury was brought in, defense counsel informed the court that Bloxton wanted to testify. The court stated: "[T]he court did inform Mr. Bloxton that it's too late for that. He was given the opportunity yesterday. He indicated he did not want to testify. So the court is not going to allow him to testify at this point."

### C. Analysis

We conclude that the trial court did not abuse its discretion by concluding that Bloxton's request to testify was untimely and inadequate. (*Alcala*, *supra*, 4 Cal.4th at p. 805.) As mentioned above, in determining whether the trial court abused its discretion in denying Bloxton's request to reopen his case and testify, we consider: " ' "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." ' " (*Masters*, *supra*, 62 Cal.4th at p. 1069.)

We begin by analyzing the first two *Masters* factors, which bear most directly on our resolution of the issue presented. Turning to these factors, it was not unreasonable for the trial court to deem Bloxton's request untimely and inadequate given that the court had already given Bloxton ample opportunity to exercise his right to testify in his own defense. Before instructing the jury, the court carefully asked Bloxton repeatedly whether he wished to testify in his defense. After discussing the matter with his attorney, including the fact that his two prior crimes of moral turpitude could be used to impeach his credibility, Bloxton chose to exercise his right to remain silent. Because the matter was

9

thoroughly addressed by the trial court at the close of the prosecution's case, at which point Bloxton waived his right to testify and invoked his right to remain silent, it was not unreasonable for the court to deny Bloxton's request to testify once the court had already fully instructed the jury.

Although in our view the first two *Masters* factors are most relevant in resolving the question presented, we will likewise address the other factors. Regarding the third *Masters* factor, Bloxton contends that because jury deliberations had not yet begun, allowing Bloxton to testify would not have put the prosecution at an unfair advantage or created a danger that the jury may give his testimony more weight than it deserved. The Attorney General counters that this factor does not play a significant role in this case, and in any event, the trial court could reasonably conclude that the jurors would accord Bloxton's testimony undue emphasis in light of the unusual circumstance of Bloxton testifying after they had been instructed and were expecting closing arguments. We agree with the Attorney General. This factor is not as relevant as the first two factors given that the trial court's stated basis for its ruling emphasized the untimeliness of Bloxton's request, as well as the fact that Bloxton had already explicitly waived his right to testify in his defense. Moreover, the trial court could reasonably conclude that changing the order of things at the time of Bloxton's request may unduly confuse the jurors.

Bloxton lastly argues that the fourth *Masters* factor cuts in his favor because the significance of a defendant testifying in his own defense "cannot be underestimated." In addition to invoking the general importance of testifying in one's own defense as a fundamental constitutional right, Bloxton notes that his counsel

10

did not call any other witnesses in his defense, and that his own "version of events would have been extremely significant." As the Attorney General points out, however, the relevance of this last factor is unknowable here because neither Bloxton nor defense counsel proffered the substance of Bloxton's testimony.

Although we agree with Bloxton that the right to testify in one's own defense is fundamental to our criminal justice system, Bloxton has not satisfied his burden on appeal of demonstrating that the trial court abused its discretion by deeming his request to testify untimely given the circumstances.

## II.     Bloxton's ineffective assistance of counsel claim

Bloxton next argues that, under section 1385, subdivision (c)(2)(B), the trial court was required to dismiss all but one of the five four-year firearm enhancements it imposed unless it found that striking the enhancements would endanger public safety, and trial counsel was prejudicially ineffective by not raising that argument in the trial court. We are unpersuaded.

In order to succeed on his claim of ineffective assistance of counsel, Bloxton must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) it is reasonably probable that he would have obtained a more favorable result absent counsel's allegedly deficient conduct. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694–695.) "Reversal . . . on the ground of inadequate counsel is mandated only if the record affirmatively reveals no rational tactical purpose for [counsel's] act or omission." (*People v. Terrell* (1999) 69 Cal.App.4th 1246, 1253 (*Terrell*).) " '[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions,' claims of ineffective assistance of counsel

11

generally must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal." (*People v. Salcido* (2008) 44 Cal.4th 93, 172.) Applying these principles, we conclude that Bloxton cannot sustain his burden of satisfying either element of his ineffective assistance of counsel claim.

First, we analyze whether the record demonstrates that trial counsel's performance at sentencing was deficient. At the beginning of sentencing, counsel made a *Romero*[5] motion, requesting that the trial court strike one or both of Bloxton's prior strike convictions, one of which occurred when Bloxton was 19 and the other when he was 22. Counsel argued that, although the charges in the instant case were "serious," "[n]obody was significantly injured in any of these robberies," and there was no evidence the gun was ever fired. Had the trial court granted the *Romero* motion, this could have reduced Bloxton's sentence significantly more than a motion for relief under section 1385, subdivision (c)(2)(B). In this court's view, it is entirely plausible that trial counsel was well aware that section 1385, subdivision (c)(2)(B) could apply here, but believed that the best tactical strategy for her client was to instead emphasize the *Romero* motion, which allowed her to argue that Bloxton's youth at the time of his prior strike offenses warranted leniency. It is similarly plausible that trial counsel believed bringing a motion under section 1385, subdivision (c)(2)(B) may be somewhat futile given that her client engaged in five armed robberies—crimes that could easily result in innocent people being gravely injured, creating a danger to public safety. (See § 1385, subd. (c)(2) [courts should not dismiss enhancements where doing so would

---

[5]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

endanger public safety].)  In other words, on this record, it is plausible that trial counsel made a calculated tactical decision to focus on the *Romero* motion, reasonably believing that this approach would place her client in the best position to get relief at sentencing.  Bloxton therefore cannot meet his burden of demonstrating that trial counsel's performance was deficient. (See *Terrell*, *supra*, 69 Cal.App.4th at p. 1253 [reversal on ineffective assistance of counsel grounds is not warranted if the record reveals a rational tactical purpose for counsel's conduct].)

Second, even assuming trial counsel had sought relief under section 1385, subdivision (c)(2)(B), on this record, it is not reasonably probable that doing so would have led to a more favorable outcome for Bloxton.  On this point, the trial court's comments when denying Bloxton's *Romero* motion and imposing sentence are telling:

> In evaluating [Bloxton's] sentence, the court has considered the general objectives in sentencing including but not limited to protecting society, punishing the defendant, deterring the defendant from future offenses, and deterring others from criminal conduct by demonstrating its consequences.
>
> This court also considered whether [Bloxton] had a record of committing similar crimes or crimes of violence.  The court has considered whether [Bloxton] participated in this crime due to any provocation, coercion, or duress not amounting to a defense, the answer is no; and whether the defendant was youthful in age with no significant prior criminal record.

13

The court thought about the nature, the seriousness and the circumstances of this crime, and whether [Bloxton] would be a danger to others if not imprisoned.

And when I look at this case, I just see no legal basis to strike his strikes even though I feel bad for him. And the reason for that is back in 2012, he was convicted of a robbery. That's his first strike. In 2016, when he was 23 years old, he was convicted of first degree burglary, his second strike. And it looks like the crimes he's committing, it's getting more and more serious.

Now, the facts in this case [are] that he, along with a codefendant, robbed five automated teller machines, repair people while they were conducting routine maintenance of the ATMs. And I know, defense, you indicated that, you know, it doesn't appear to be a serious crime, nobody was injured, but I disagree. When these repair individuals had guns pointed to them, that's significant to them. I believe there was also evidence that [Bloxton] had possibly pistol-whipped somebody.[6] And—and the most shocking thing about this case is that a lot of these crimes were committed in broad daylight, with other cars driving by,

---

[6]     The evidence presented at trial indeed showed that one of the ATM repairmen was hit in the back of the head with a gun as he was robbed.

14

with other people around, with a total disregard for the safety of other people and—and, personally, without fear of any consequences.

Again, this is a case where the jury found [Bloxton] guilty. So based on all the information that has been provided to the court, based on the reasoning the court has stated, the court is not satisfied on how dismissing any of [Bloxton's] prior strikes would be in the interest of justice and[ ] therefore, defense motion will be denied.

Prior to pronouncing Bloxton's sentence, the court stated that the circumstances in aggravation "far outweigh any mitigation in this case." Based on these comments, it is clear that the trial court had decided, in the interests of justice, and out of concerns regarding the danger Bloxton posed to society, that it would not reduce his sentence. Given the thoroughness of the trial court's rationale for its ruling, and because the court was steadfast in imposing the sentence it did, we conclude that it is not reasonably probable that Bloxton would have received a more favorable outcome had trial counsel made a motion under section 1385, subdivision (c)(2)(B) to have firearm enhancements stricken. Bloxton thus cannot satisfy his burden of demonstrating that he was prejudiced by trial counsel's performance.[7]

---

[7] In arguing that trial counsel was prejudicially ineffective, Bloxton contends that the trial court could not have made a showing that Bloxton posed a danger to public safety. Bloxton argues: "Here, in order to deny a request to strike the four gun

15

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

 

 

                                        TAMZARIAN, J.

We concur:

 

 

ZUKIN, P. J.

 

 

COLLINS, J.

---

enhancements, the trial court would have had to make a showing that [striking the enhancements] would be a danger to public safety.  It would not have been able to do so."  We reject this contention, and instead conclude, given the circumstances of Bloxton's offenses, that it was not an abuse of discretion for the trial court, in imposing the sentence it did, to conclude that Bloxton posed a danger to public safety.

16